No. 26-8010

In The

# United States Court of Appeals for the Eighth Circuit

*In re Cattle and Beef Antitrust Litigation*

On Petition for Permission to Appeal from the United States District Court for the District of Minnesota, No. 0:22-MD-3031
Chief Judge John R. Tunheim

**Petitioners-Defendants' Petition for Review of Order Granting Class Certification of Cattle Plaintiff Damages Class Pursuant to Federal Rule of Civil Procedure 23(f)**


Michelle Fischer
**JONES DAY**
901 Lakeside Avenue, North Point
Cleveland, OH 44114
216-586-3939
mfischer@jonesday.com

Julia E. McEvoy
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3867
jmcevoy@jonesday.com

Benjamin L. Ellison
**JONES DAY**
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8800
bellison@jonesday.com

Eddie Hasdoo
**JONES DAY**
110 North Wacker, Suite 4800
Chicago, Illinois 60606
(312) 269-4214
ehasdoo@jonesday.com

Kurt Johnson
**JONES DAY**
150 W Jefferson Avenue, Suite 2100
Detroit, MI 48226
(313) 733-3939
kajohnson@jonesday.com

***Counsel for Petitioner-Defendant National Beef Packing Company, LLC***

Karl J. Worsham
Kristine J. Beaudoin
**ASHURST PERKINS COIE US LLP**
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
Tel: (602) 351-8000
Karl.Worsham@ashurstperkins.com
Kristine.Beaudoin@ashurstperkins.com

Susan E. Foster
Katherine Galipeau
**ASHURST PERKINS COIE US LLP**
1301 Second Ave, Suite 4200
Seattle, WA 98101-3804
Tel: (206) 359-8000
Susan.Foster@ashurstperkins.com
Katie.Galipeau@ashurstperkins.com

Veronica N. Onyema
Jon B. Jacobs
Ryan Maddock
**ASHURST PERKINS COIE US LLP**
700 13th Street, NW, Suite 800
Washington, DC 20005-3960
Tel: (202) 654-6200
Veronica.Onyema@ashurstperkins.com
Jon.Jacobs@ashurstperkins.com
Ryan.Maddock@ashurstperkins.com

H. Rowan Gaither IV
**ASHURST PERKINS COIE US LLP**
1155 Avenue of the Americas, Floor 22
New York, NY 10036-2711
Tel: (212) 262-6900
Rowan.Gaither@ashurstperkins.com

***Counsel for Petitioners-Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc*.**

Beth A. Wilkinson
Kosta S. Stojilkovic
Sarah Neuman
David R. Friedman
**WILKINSON STEKLOFF LLP**
2001 M Street, NW, 10th Floor
Washington, DC 20036
(202) 847-4010
bwilkinson@wilkinsonstekloff.com
kstojilkovic@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
dfriedman@wilkinsonstekloff.com

X. Kevin Zhao
Holley C. M. Horrell
Davida S. McGhee Williams
Nicholas Scheiner
Emily M. McAdam
Taofikat Ninalowo-Olaofe
**GREENE ESPEL PLLP**
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
kzhao@greeneespel.com
hhorrell@greeneespel.com
dwilliams@greeneespel.com
emcadam@greeneespel.com
nscheiner@greeneespel.com
tninalowo-olaofe@greeneespel.com

Jacob D. Bylund
Robert C. Gallup
Dasha Ternavska
**FAEGRE DRINKER BIDDLE & REATH LLP**
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
robert.gallup@faegredrinker.com
dasha.ternavska@faegredrinker.com

Joan A. Akalaonu
**FAEGRE DRINKER BIDDLE & REATH LLP**
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
(312) 569-1000
joan.akalaonu@faegredrinker.com

Moira Penza
Owen Gallogly
Emily Clarke
**WILKINSON STEKLOFF LLP**
130 W 42nd Street, Floor 24
New York, NY 10036
(212) 294-8910
mpenza@wilkinsonstekloff.com
ogallogly@wilkinsonstekloff.com
eclarke@wilkinsonstekloff.com

***Counsel for Petitioners-Defendants Cargill, Incorporated and Cargill Meat Solutions Corporation***

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Petitioners-Defendants make the following disclosures:

Petitioner-Defendant National Beef Packing Company, LLC ("National Beef") certifies that National Beef is majority owned by NBM US Holdings, an indirect subsidiary of MBRF Global Foods S.A. ("MBRF"). MBRF is thus identified as the parent corporation of National Beef and the only publicly held corporation that owns 10% or more of National Beef stock.

Petitioner-Defendant Tyson Foods, Inc. has no parent corporation, and no other publicly held corporation owns 10% or more of its stock. Petitioner-Defendant Tyson Fresh Meats, Inc. is a wholly owned subsidiary of Tyson Foods, Inc. No publicly held corporation other than Tyson Foods, Inc. owns 10% or more of Tyson Fresh Meats, Inc.'s stock.

Petitioners-Defendants Cargill, Incorporated and Cargill Meat Solutions Corporation certify as follows: Cargill Meat Solutions Corporation is a wholly owned subsidiary of Cargill, Incorporated, a private company. No publicly held corporation owns 10% or more of Cargill, Incorporated stock.

Dated: July 30, 2026

*/s/ Michelle Fischer*
Michelle Fischer

*Counsel for Petitioner-Defendant National Beef Packing Company, LLC*

*/s/ Karl J. Worsham*
Karl J. Worsham

*Counsel for Petitioners-Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc.*

*/s/ Kosta S. Stojilkovic*
Kosta S. Stojilkovic

*Counsel for Petitioners-Defendants Cargill, Incorporated and Cargill Meat Solutions Corporation*

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................. iv
TABLE OF CONTENTS ................................................................ vi
TABLE OF AUTHORITIES ............................................................ vii
INTRODUCTION ........................................................................ 1
RELIEF SOUGHT ........................................................................ 5
JURISDICTIONAL STATEMENT ................................................ 5
ISSUES PRESENTED ................................................................. 6
BACKGROUND .......................................................................... 6

A. Factual Background. ........................................................... 6

B. Evidentiary Background. ..................................................... 9

C. Procedural Background. ..................................................... 10

STANDARD OF REVIEW ........................................................... 11
REASONS FOR GRANTING REVIEW ....................................... 11
I. THE BURDEN ERROR REQUIRES REVERSAL ...................... 13
II. THE PROOF ERROR REQUIRES REVERSAL. ........................ 20
CONCLUSION .......................................................................... 21
CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE
COPY OF ORDER AND OPINION
ADDRESSES FOR CASE PARTICIPANTS

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Avritt v. Reliastar Life Ins. Co.*,
615 F.3d 1023 (8th Cir. 2010)....................................................21

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005)..................................12, 14, 19, 20

*Cody v. City of St. Louis ex rel. Medium Sec. Inst.*,
103 F.4th 523 (8th Cir. 2024)....................................................12

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...............................................12, 14, 15, 17

*Elizabeth M. v. Montenez*,
458 F.3d 779 (8th Cir. 2006)......................................................11

*Glasscock v. Sig Sauer, Inc.*,
No. 25-2707, slip. op. (8th Cir. July 16, 2026)..............................21

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020)....................................................17

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
140 F. Supp. 3d 339 (D. Del. 2015) ...........................................18

*In re Flint Water Cases*,
558 F. Supp. 3d 459 (E.D. Mich. 2021).......................................13

*In re Folgers Coffee Mktg.*,
159 F.4th 1151 (8th Cir. 2025)...................................................12

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020)......................................................18

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 124 (E.D. Pa. 2015)....................................................................17

*In re State Farm Fire & Cas. Co.*,
872 F.3d 567 (8th Cir. 2017)........................................................................15

*In re Wholesale Grocery Prods. Antitrust Litig.*,
2012 WL 3031085 (D. Minn. July 25, 2012), *affirmed in relevant part by* 752 F.3d 728 (8th Cir. 2014)..........................................................14

*Johannessohn v. Polaris Indus. Inc.*,
9 F.4th 981 (8th Cir. 2021) ............................................................... 20, 21

*Luiken v. Domino's Pizza, LLC*,
705 F.3d 370 (8th Cir. 2013)........................................................................11

*Miami Prods. & Chem. Co. v. Olin Corp.*,
2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023) ............................................18

*Microsoft Corp. v. Baker*,
582 U.S. 23 (2017).......................................................................................11

*Prado-Steiman ex rel. Prado v. Bush*,
221 F.3d 1266 (11th Cir. 2000) ....................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .....................................................................................20

**STATUTES**

28 U.S.C. § 1292(e) ..........................................................................................5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23.............................................................11, 12, 13, 18, 20

Fed. R. Civ. P. 23(b)(2) ..............................................................................10

Fed. R. Civ. P. 23(b)(3) ........................................................................*passim*

Fed. R. Civ. P. 23(f)........................................................................................5

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011). 14

## INTRODUCTION

In its decision certifying a damages class in this case, the district court committed two critical legal errors. Both go to fundamental requirements of Rule 23(b)(3)—the first to the *burden assigned*, and the second to the *proof required*. Both errors require this Court's review and reversal.

**The Burden Error.** The district court failed to resolve a dispute material to the class certification inquiry, effectively converting Plaintiffs' burden of proof at class certification into Defendants' burden of proof at trial. That error renders the Rule 23(b)(3) inquiry futile and requires correction.

For a district court to certify a class under Rule 23(b)(3), plaintiffs must carry their burden on predominance—including by showing they can prove impact on all (or nearly all) putative class members with common evidence. The district court in this case recognized Plaintiffs had *not* done so, and yet certified a damages class, reasoning: "[w]hile Defendants may be correct that the alleged episodic conduct had only episodic [*i.e.*, not common] impact, Defendants would have to present evidence to that end to undermine [Plaintiffs'] theory of harm to the fact finder at trial." R. Doc. 1609, at 30. This is a manifest legal error. On the question of whether common evidence can show common impact under Rule 23(b)(3), *plaintiffs* (not defendants) have the burden to prove such impact to the *court* (not a jury) at the time of *certification* (not at trial). The district court's approach eviscerates this rule.

Indeed, this case is a textbook example of why the district court's approach is flawed. This case concerns an alleged conspiracy involving the slaughter of fed cattle. Plaintiffs (fed cattle sellers) allege Defendants (fed cattle buyers) conspired to reduce the slaughter of fed cattle to reduce their price, and thereby actually reduced the price of fed cattle nationwide for nearly five years.

Critically, however, Plaintiffs' alleged conspiracy involves conduct that is *not persistent* but *episodic*. Plaintiffs do not allege, and could not allege, that any fed cattle actually went unslaughtered during the alleged conspiracy period. Plaintiffs instead allege only that Defendants sporadically reduced their cattle purchases by "backing up" (*i.e.*, not purchasing for a time) fed cattle in different (unidentified) regions at different (unidentified) times. Moreover, Plaintiffs admit that many class members sold fed cattle only sporadically to Defendants throughout the alleged conspiracy period, with a substantial portion transacting only once. Both sides' conduct is therefore episodic. And Plaintiffs thus do not present a traditional supply-reduction theory alleging Defendants uniformly reduced the total slaughter of fed cattle during the alleged conspiracy period.

To meet their Rule 23(b)(3) burden for this case theory, Plaintiffs needed to show with common evidence that sporadic actions had classwide impact, even on occasional cattle sellers; *i.e.*, that Defendants' episodic conduct (alleged "backing up" in cattle buying, for, hypothetically, two weeks in Omaha in 2016) aligned with

Plaintiffs' episodic conduct (cattle selling, for, hypothetically, a week in Amarillo in 2018) such that there was common impact on the whole class throughout the entire alleged conspiracy period.

But Plaintiffs failed to do so. They offered no evidence even attempting to connect the alleged "backing up" with classwide impact. Plaintiffs failed to assess even a single instance of alleged "backing up," let alone show how such instances—localized and sporadic conduct—could lead to ongoing price impacts affecting the entire class. This failure is especially significant because it is undisputed that 20% of class members sold fed cattle only once during the entire alleged conspiracy period, and almost half sold only a handful of times. Indeed, Plaintiffs did none of this notwithstanding their concession that any given instance of alleged "backing up" could not impact fed cattle prices across the nation and for the entire five-year alleged conspiracy period. Plaintiffs thus disregarded their burden to link the case theory they allege with the common impact they claim.

Given this failure, the district court should have denied certification—holding Plaintiffs had failed to meet their burden. Instead, despite recognizing that Defendants "may be correct" that the alleged episodic conduct led to only episodic (*i.e.*, not common) impact, the district court held *Defendants* could attempt to show lack of common impact *at trial*. This legal error requires review and reversal.

**The Proof Error.** The district court not only failed to hold Plaintiffs to their most basic burden under Rule 23(b)(3), it credited supposed proof of common impact on the class members by relying on supposed proof of common impact on a *proxy* for them. This legal error also requires review and reversal.

Rather than offer evidence linking the alleged "backing up" to any classwide impact, in a bid to carry their Rule 23(b)(3) burden, Plaintiffs proffered a common average price regression. Even assuming this off-the-shelf option could be sufficient in this unique case centered on episodic conduct, Plaintiffs' proffered regression cannot provide the proof necessary under Rule 23(b)(3) because it was not run on fed cattle owners, the actual class members. Plaintiffs instead ran their regression only on feedlots, many of which are not class members because they do not themselves produce (or own) fed cattle but rather sell on behalf of multiple fed cattle producers (or owners). Plaintiffs claim feedlots are a workable proxy for fed cattle owners. That itself is a problem—for there is no such thing as common (or any) impact by proxy. But the problem is magnified by the undisputed fact that a single feedlot can sell fed cattle for as many as 100 different fed cattle owners. And that, in turn, means that unimpacted feedlots—and Plaintiffs' regression shows there were dozens—could mean thousands of unimpacted and thus uninjured class members. Removing the thousands of potentially uninjured class members would require individualized evidence, making certification under Rule 23(b)(3) plainly improper.

Given this reality, the district court should have denied certification, holding Plaintiffs had not offered the proof required to establish common impact and, thus, predominance. Instead, it improperly allowed proof of class impact to be shown via proof of proxy impact and, in so doing, also failed to address the unimpacted multiplier effect of unimpacted feedlots. This approach should not be permitted in any circuit—but especially not in this one, given this Court's rule that a class cannot be certified if it contains uninjured members. This legal error, too, requires review and reversal.

Rule 23(f) is for cases just like this, where manifest legal errors led to the certification of a class seeking damages of $9 billion—before trebling.

## RELIEF SOUGHT

This Court should grant the petition, receive briefing and argument, and reverse the order certifying a damages class in this case.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to grant this appeal under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). Under Rule 23(f), Defendants timely filed this petition within 14 days of the July 16, 2026 entry of the order below.

## ISSUES PRESENTED

Each of the questions presented involves instances in which the district court absolved Plaintiffs of fundamental requirements of Rule 23(b)(3):

1. Did the district court err in certifying a damages class by shifting Plaintiffs' burden to show predominance at the class certification stage to Defendants' burden to show lack of predominance at trial?
2. Did the district court err in certifying a damages class where Plaintiffs concededly relied on a purported proxy to attempt to establish supposed common impact?

## BACKGROUND

This case is one of five putative class actions brought by members of the cattle and beef industry against four leading packers. Those in the industry upstream of the packers (*i.e.*, cattle owners) allege the packers paid too little for cattle; those downstream of the packers (*i.e.*, beef buyers and distributors) allege the packers charged too much for beef. This petition concerns one of the upstream classes comprised of cattle producers who directly sold their cattle to Defendants—what the district court called the Damages Class in the relevant portion of its decision.[1]

### A. Factual Background.

This case is about fed cattle. Fed cattle are cattle that are fattened at a feedlot

[1] This case involving direct sellers (*In re Cattle*) was handled together with the case involving indirect sellers (*In re Indirect Cattle Sellers*) in one district court decision. The district court denied certification of any class comprised of indirect sellers and that portion of the decision is not at issue here. The district court also issued a separate decision granting certification of three downstream classes, which is subject to a separate petition.

before purchase by a packer for slaughter. R. Doc. 883-1, at ¶¶ 8, 17-18.[2] Fed cattle may take several paths on the two-to-three-year journey from birth to slaughter. *Id.* at ¶¶ 17, 21, 25, 61; R. Doc. 1099-2, at 202:2–205:15. One path comprises cattle producers who own their own feedlots and feed their own cattle until they sell them for slaughter. R. Doc. 883-1, at ¶¶ 21, 43. A second path comprises cattle producers who sell their cattle to a feedlot, which then sells them for slaughter. *Id.* In both these paths, the feedlot owns the fed cattle at the point-of-sale. Most relevant here is a third path in which cattle producers pay a feedlot to feed the cattle but retain ownership until the sale for slaughter. *Id.* A significant percentage of cattle producers opt for such arrangements. *Id.* at ¶¶ 36, 38. In such arrangements, a single feedlot can sell fed cattle for as many as 100 different cattle producers. *Id.* at ¶ 43 n.67. Regardless of which path fed cattle take, once slaughter-ready, they are sold to packers. Some are sold in a cash market shortly before slaughter; most fed cattle, however, are sold through contracts, which can incorporate the price of fed cattle sold in the cash market. *Id.* at ¶¶ 129–44.

This case is also about how Plaintiffs and Defendants allegedly interact with respect to fed cattle. Plaintiffs allege (and have from the start) that Defendants purchased (or chose not to purchase) fed cattle on an episodic basis: Defendants

---

[2] The R. Doc. references refer to *In Re: Cattle and Beef Antitrust Litigation*, Docket No. 22-md-03031.

"periodically reduce[d] [their] respective purchase and slaughter volumes … to reduce the prices [they] would otherwise pay for fed cattle." R. Doc. 312, at ¶ 18; *see also* 19-cv-1222 ECF No. 92 First Am. Compl. ¶ 80 (similar), ECF No. 125 Second Am. Compl. ¶¶ 16, 88 (similar). Plaintiffs call this alleged episodic slaughter reduction "backing up" (*i.e.*, the queue of cattle ready for slaughter gets "backed up"). R. Doc. 883-1, at ¶ 319. Per Plaintiffs, this "backing up" gave "Defendants leverage in negotiations with cattle producers" because fed cattle have only "a short window in which to be optimally marketed." *Id.* at ¶¶ 320–21. Plaintiffs' allegation of periodic (rather than permanent) reductions in slaughter tracks their admission that every fed cattle they offered for sale was eventually slaughtered. R. Doc. 1099-2, at 129:6–10.[3]

Not only is Defendants' alleged conduct (buying or not) episodic, Plaintiffs' conduct (selling) is also episodic. Given the two-to-three years required to raise fed cattle for slaughter, most Plaintiffs only made irregular sales to Defendants: throughout the entire alleged conspiracy period, approximately half of the at-issue feedlots had five or fewer transactions with Defendants, and a fifth had only one. R. Doc. 1257-1, at ¶ 188; R. Doc. 1099, at ¶ 115.

[3] Plaintiffs' core assertion is that Defendants engaged in episodic slaughter reductions to reduce fed cattle prices. Contrary to the district court's opinion, R. Doc. 1609, at 1, 45, *see also id.* at 25, Plaintiffs do not allege Defendants conspired to fix the price of fed cattle.

### B. Evidentiary Background.

Establishing how alleged *episodic* cattle "backing up" by Defendants, undertaken in relation to *episodic* cattle selling by Plaintiffs, could lead to common impact on all (or virtually all) class members for nearly five years is no easy task. For that task, Plaintiffs relied entirely on Dr. Russell Lamb's opinions. Two points about those opinions are key.

First, Lamb's opinions do not include a model attempting to show common impact tied to Plaintiffs' actual case theory. Lamb did not attempt to (1) model fed cattle slaughter but-for the alleged conspiracy, (2) identify instances of alleged "backing up," or (3) show how such admittedly episodic instances could affect transactions at other times and places such that they would lead to classwide impact nationwide for the nearly five-year alleged conspiracy period. R. Doc. 883-1, at ¶¶ 319–23; R. Doc. 1099-2, at 159:17–160:10.

Second, Lamb's opinions supporting certification rest chiefly on his economic modeling—specifically, a common average price regression and attendant in-sample prediction model. R. Doc. 883-1, at ¶¶ 409–11. With these, Lamb purports to show common impact by opining that the overwhelming majority of feedlots subject to the regression and attendant in-sample prediction model received at least one alleged underpayment during the alleged conspiracy period. *Id.* at ¶ 412. Yet Plaintiffs are not seeking to represent a putative class of feedlots, but a putative class of cattle

producers—some of which are feedlots, but many of which are not. *Id.* at ¶¶ 412–13. Moreover, Plaintiffs' reliance on averages tied to feedlot transactions as a proxy for actual class members masks the impact (or lack thereof) on the actual class members.

### C. Procedural Background.

Plaintiffs sought certification of three classes: a Rule 23(b)(3) damages class of those who sold fed cattle to Defendants ("Damages Class"), a Rule 23(b)(3) damages class of those that held long positions in Live Cattle Futures ("Exchange Class"), and a Rule 23(b)(2) injunctive relief class ("Injunctive Relief Class").

The district court certified the Damages Class and denied certification of the Exchange Class and the Injunctive Relief Class. The most important aspects of the court's decision go to the two errors raised in this petition concerning the Damages Class: *first*, the court recognized that Defendants may be correct that individual issues predominate but held that Defendants could attempt to establish as much at trial, R. Doc. 1609, at 30 (the "Burden Error"); *second*, the court recognized that Plaintiffs had attempted to prove common impact with a proxy but held this is permissible notwithstanding the masking of uninjured class members by the chosen proxy, *id.* at 33 (the "Proof Error").

One other aspect of the district court's opinion is relevant to this petition, and it relates to a "tension" the court flagged between its decision not to certify the

Exchange Class but to certify the Damages Class. *Id.* at 32 n.22. That tension stems from the reality that the two classes claim the same basic injury—artificial suppression of fed cattle prices from Defendants' alleged conspiracy—and that the court held this purported artificial suppression was not consistent (or common) enough to lead to the necessary common impact on the Exchange Class, even as the court resisted that same conclusion when it came to the Damages Class. With respect to the Damages Class, the court instead held that Defendants could advance arguments for lack of common impact to a jury at trial.

## STANDARD OF REVIEW

This Court may grant interlocutory review of the class certification order "on the basis of *any* consideration." *Microsoft Corp. v. Baker*, 582 U.S. 23, 32–33 (2017) (quoting advisory committee's note to 1998 amendment). But review is especially appropriate where the district court applied the wrong legal standard. *See Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1274–75 (11th Cir. 2000); *Elizabeth M. v. Montenez,* 458 F.3d 779, 783 (8th Cir. 2006). Review is also appropriate where the certification order will unduly pressure defendants into an *in terrorem* settlement. *See Microsoft*, 582 U.S. at 32; *Prado-Steiman*, 221 F.3d at 1274–76.

## REASONS FOR GRANTING REVIEW

Plaintiffs bear the burden of showing they have met each requirement of Rule 23. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). To

determine whether plaintiffs have done so, a district court must conduct a "rigorous analysis" of the evidence. *Cody v. City of St. Louis ex rel. Medium Sec. Inst.*, 103 F.4th 523, 530 (8th Cir. 2024) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). And that analysis must be "even more demanding" where, as here, plaintiffs seek certification under Rule 23(b)(3). *Id.* (quoting *Comcast*, 569 U.S. at 34); *In re Folgers Coffee Mktg.*, 159 F.4th 1151, 1154–55 (8th Cir. 2025).

Here, the relevant evidence subject to the "even more demanding" "rigorous analysis" comes from Lamb's opinions. As this Court has explained, when plaintiffs "propose to use such a method [*i.e.*, expert models] to prove injury, they must show that it could work to prove classwide injury with common evidence." *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005).

Plaintiffs have not done so, even if the Court accepts Lamb's opinions at face value. Indeed, the two errors raised in this petition, the Burden Error and the Proof Error, *assume Lamb's opinions and model are sound*—yet both necessitate reversal of the district court's certification order as to the Damages Class. Respectfully, this Court should take a hard look at this case. The stakes are high—for both the law of Rule 23 and the parties in this case.

The stakes are high for the law of Rule 23 because, to allow the certification order to stand would be to allow a court to certify a class after recognizing the plaintiffs had *not* carried their burden to prove common impact with common

evidence at the class certification stage, and instead impose on defendants the burden of showing individualized impact at trial, effectively rendering the Rule 23 inquiry a nullity. That is not—and cannot be—the law, for "[t]here is no jury reviewing [Plaintiffs'] motion for class certification; the Court is the only audience for the parties' class certification arguments and their factual underpinnings." *In re Flint Water Cases*, 558 F. Supp. 3d 459, 524 (E.D. Mich. 2021).

The stakes are high for the parties because the court's certification of a class claiming $9 billion in damages (before trebling), despite many uninjured class members, may wrongfully force Defendants into an *in terrorem* settlement.

This Court must intervene to ensure Plaintiffs cannot use a fundamental misapplication of Rule 23 to saddle Defendants with both the burden Plaintiffs bear and the prospect of crippling liability.

## I. The Burden Error Requires Reversal.

The district court's most basic legal error was its failure to hold Plaintiffs to their burden under Rule 23(b)(3). The court committed this error by punting the core question of predominance—stating it would not be resolved by the court now but by a jury at trial.

In that regard, Plaintiffs allege, as explained above, that Defendants episodically reduced cattle purchases by "backing up" fed cattle in different (unidentified) regions at different (unidentified) times. They further admit that

Plaintiffs' fed cattle sales to Defendants were similarly sporadic: using feedlots as a stand-in for cattle owners, they acknowledge that 20% of feedlots sold only once, and 49% sold five or fewer times, during the entire class period.

Both sides' conduct is therefore episodic, which means that, to carry their Rule 23(b)(3) burden, Plaintiffs had to establish with common evidence that Defendants' episodic conduct aligned with Plaintiffs' sporadic selling such that common impact could be shown for the entire alleged conspiracy period.[4]

On this, the Supreme Court has left no doubt: to meet the predominance requirement of Rule 23(b)(3), plaintiffs must show the model they offer "translate[s] [their] *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Comcast*, 569 U.S. at 38 (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 432 (3d ed. 2011)). This Court said the same: when plaintiffs "propose to use" an expert model "to prove injury, they must show … [it] could work to prove classwide injury with common evidence" linked to the anticompetitive conduct they alleged. *Blades*, 400 F.3d at 575; *see also, e.g.*, *In re Wholesale Grocery Prods. Antitrust Litig.,* 2012 WL 3031085, at *10 (D. Minn. July

[4] At argument, the district court recognized as much, noting the undisputed evidence that there are a "substantial number of feedlots" (selling on behalf of as many as 100 cattle producers) where "there was only one [sale] during the [class] period" and that "[s]maller members . . . selling at a particular time . . . might be typically an uninjured party." R. Doc. 1491, at 34:4–11, 41:13–17.

25, 2012) ("[Plaintiffs] must produce a method of confirming that theory matched reality for each class member because they bear the burden of proving impact."), *affirmed in relevant part by* 752 F.3d 728 (8th Cir. 2014). The district court must then rigorously review that model to decide if it shows common impact. *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 572 (8th Cir. 2017). If plaintiffs "ignore[]" this "first step," and fail to offer a model linking the asserted theory with the asserted impact, the class cannot be certified. *Comcast*, 569 U.S. at 38.

Here, Plaintiffs failed to take that first, essential step, as Lamb's opinions show. Lamb summarized Plaintiffs' theory as follows: Defendants "[A] agreed to collectively restrain the volume of cattle purchased and [B] subsequently slaughtered below available supply … to [C] suppress demand for … cattle sold in the 'cash' market … [which] … [D] artificially reduced the prices at which fed cattle were sold in the 'cash' market, which in turn [E] artificially reduced prices of fed cattle sold through alternative marketing arrangements … [containing pricing mechanisms tied to cash cattle prices]," with the result that [F] all fed cattle prices were decreased. R. Doc. 883-1 ¶ 9. The asserted theory is not a simple A-to-B case. It is an A-to-B-to-C-to-D-to-E-to-F case. Plaintiffs here, as everywhere, can choose to plead an A-to-B case, or an A-to-F case. But what plaintiffs plead, they must prove. *Comcast*, 569 U.S. at 38. And in class actions, more is required: plaintiffs must show the case they pled can be proved *with common evidence*. Here, that means Plaintiffs must show

how they will use common evidence to connect the dots from A to F.

That is exactly what Plaintiffs have not done (nor even tried). Lamb did not even show A—he concededly failed to identify any instance of alleged "backing up." R. Doc. 1099-2, at 160:1–10; R. Doc. 1257-1, at ¶¶ 50–51. Nor did he explain why "backing up" in one place and time would lead to price effect at another place for another time. R. Doc. 1099-2, at 160:20–162:22. And he failed to do this *even after admitting that one instance of "backing up" would not impact all feedyards nationwide for the entire class period*—thereby acknowledging that, for Plaintiffs' asserted case theory to even get past "go," he would need to show enough backing up, in enough places, with enough frequency to cause a sustained price effect nationwide. R. Doc. 1099-2, at 150:3–9, 159:3–22; R. Doc. 1257-1, at ¶ 53. He did not do this (A); nor B, C, D, E, or F. Plaintiffs thus failed to offer the common evidence needed to meet their Rule 23(b)(3) burden.

To be sure, Plaintiffs argued otherwise, pointing chiefly to Lamb's common average price regression and opinions about market structure. Neither is sufficient.

*The regression is insufficient.* The principal bases for Lamb's opinions were his common average price regression and attendant in-sample prediction model. R. Doc. 883-1, at ¶¶ 409–11. These are insufficient because Plaintiffs' theory is *not* that Defendants suppressed total slaughter by slaughtering fewer fed cattle throughout the nearly five-year alleged conspiracy period. Nor could it be their theory, because

Defendants increased fed cattle slaughter during that period from the preceding five-year period, R. Doc. 1099, at ¶¶ 122–24; *see* R. Doc. 883-1, at ¶ 97 & Table 7, and because the fed cattle industry is not vertically integrated: Defendants in *this* protein antitrust action do not control the supply of the animal available for slaughter—Plaintiffs do—and all fed cattle offered for slaughter by Plaintiffs were in fact purchased and slaughtered. Hence, Plaintiffs' *periodic* suppression theory.

Such a theory needs more than a bare common average price regression. Indeed, courts have found such regressions "particularly troubling" as a basis for common impact where, as here, the case theory involves "significant variation in the level of purported conspiratorial activity at any given moment during the class period." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020). To do that is to use "averages and aggregations" to "mask[] individualized issues that are likely to predominate," *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 159 (E.D. Pa. 2015), and to skirt the necessary "translat[ion]" of case theory to common impact. *Comcast*, 569 U.S. at 38.

*The market structure is insufficient.* Beyond the regression and in-sample prediction, the other principal basis for Lamb's opinion was his market structure analysis. R. Doc. 883-1, at ¶¶ 380–408. But this is also insufficient because it does not establish that the alleged unlawful activity—episodic "backing up"—actually flowed through any price structures to affect each class member. Or, as one court

put it when denying certification based on another Lamb model: "in the absence of common proof of a mechanism whereby the alleged cartel could have raised prices on class members …, the existence of a pricing structure cannot demonstrate classwide antitrust injury." *Miami Prods. & Chem. Co. v. Olin Corp.,* 2023 WL 8946114, at *19 (W.D.N.Y. Dec. 28, 2023).[5]

Ultimately, nothing Plaintiffs offered—not the regression, market structure, nor anything else—carried Plaintiffs' burden to show how the unique conspiracy they allege affected each putative class member.

And, most importantly here, the district court recognized as much: after reviewing the evidence and arguments, the court ultimately acknowledged that "Defendants may be correct that the alleged episodic conduct had only episodic impact." R. Doc. 1609, at 30. Having identified the material dispute about whether Plaintiffs had shown predominance under Rule 23(b)(3), the district court was obligated to then resolve it. Instead, the court committed legal error by deferring the

[5] *Miami Products* is not the only recent case where Lamb's opinions were insufficient to carry the plaintiffs' Rule 23 burden. *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) (on interlocutory review, reversing certification order that failed to apply a rigorous analysis to determine whether Lamb's average price model "mask[ed] individualized injury"); *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp. 3d 339, 353 (D. Del. 2015) (denying certification, including because Lamb "utilize[d] assumptions based on a modicum of data not fully representative" of underlying transactions).

decision to a jury trial. *See id.*

Were there any doubt, the Court's decision concerning the Exchange Class should resolve it. In denying certification of the Exchange Class, the district court recognized that Exchange Class Plaintiffs and Defendants disputed whether the Exchange Class Plaintiffs' common average underpayment model masked uninjured class members. But the district court did not send this dispute to a jury. Instead, the court fulfilled its responsibility to resolve the dispute, properly crediting "the evidence presented by Defendants' expert . . . that more than a *de minimis* number of [class members] were not damaged," and then denying certification. The district court should have followed the same course as to the Damages Class—indeed, it recognized that there was "tension" between its finding of a lack of common impact on the Exchange Class and its decision nonetheless to certify the Damages Class. *Id.* at 32 n.22. Yet the court did nothing to resolve that tension.

Having acknowledged that Defendants "may be correct" that episodic conduct could mean only episodic (*i.e.*, not common) impact, and then having properly found only episodic impact when it came to the Exchange Class, the court should have concluded that Plaintiffs did not meet their Rule 23(b)(3) burden to "show that [the model they offered] could work to prove classwide injury with common evidence." *Blades*, 400 F.3d at 575. But it did not do so. Instead, it transformed *Plaintiffs' class certification burden* into *Defendants' trial burden*, abdicating its duty to decide

whether Plaintiffs had demonstrated they met each of Rule 23's requirements by a preponderance of the evidence *before* certifying the class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

This error requires review and reversal.

## II. The Proof Error Requires Reversal.

Not only did the district court fail to hold Plaintiffs to their Rule 23(b)(3) burden, it allowed Plaintiffs to offer unprecedented proof purportedly in support of it. This separate error provides an independent basis for review and reversal.

To satisfy Rule 23(b)(3), a plaintiff must show that generalized proof can answer questions "common to the *class*." *Blades*, 400 F.3d at 569 (emphasis added). Here, Plaintiffs' generalized proof consists chiefly of a common average price regression that, at best, answers questions common to *feedlots*. But Plaintiffs have admitted that feedlots are "not always the same as the cattle producer," *i.e.*, the putative class member. R. Doc. 883-1, at ¶ 413. At most, a feedlot is a mere "proxy," as the district court acknowledged. R. Doc. 1609, at 33. But showing common impact on a proxy is not showing common impact across class members. *Blades*, 400 F.3d at 569. And Defendants are aware of no case (and neither Plaintiffs nor the district court identified any) where impact-by-proxy has been the basis for certification. Certainly not in this Circuit, where the law requires that a "class … be defined in such a way that *anyone* within it" is impacted. *Johannessohn v. Polaris*

*Indus. Inc.*, 9 F.4th 981, 987-88 (8th Cir. 2021) (emphasis added) (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010)). Accordingly, allowing proof of impact by proxy is itself a problem.

But there is more. Even if the Court were to accept that common impact could be shown by "proxy," Plaintiffs' proffered proxy did not actually prove the requisite common impact on putative class members. That is because there is no dispute both that Plaintiffs' proffered regression found dozens of unimpacted feedlots, and that one feedlot can represent as many as 100 different class members (R. Doc. 883-1, at ¶¶ 43 n.67, 412). This leads to a multiplier effect—one unimpacted feedlot may equal 100 unimpacted class members—and means *thousands* of uninjured class members. Despite bearing the burden of proof, Plaintiffs failed to show otherwise, and the district court entirely ignored this problem. But it is a material one. If thousands are unimpacted, the class cannot be certified—neither under the *de minimis* rule the district court applied, R. Doc. 1609, at 16, nor under this Court's rule that a "district court may not certify a class defined in such a way that 'it contains members who lack standing.'" *Glasscock v. Sig Sauer, Inc.*, No. 25-2707, slip. op. at 2 (8th Cir. July 16, 2026) (quoting *Johannessohn*, 9 F.4th at 987)).

This error, too, requires review and reversal.

## CONCLUSION

This Court should grant the petition.

July 30, 2026

Respectfully submitted,

*/s/ Michelle Fischer*
Michelle Fischer

Julia E. McEvoy
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3867
jmcevoy@jonesday.com

Michelle Fischer
**JONES DAY**
901 Lakeside Avenue, North Point
Cleveland, OH 44114
216-586-3939
mfischer@jonesday.com

Eddie Hasdoo
**JONES DAY**
110 North Wacker, Suite 4800
Chicago, Illinois 60606
(312) 269-4214
ehasdoo@jonesday.com

Benjamin L. Ellison
**JONES DAY**
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8800
bellison@jonesday.com

Kurt Johnson
**JONES DAY**
150 W Jefferson Avenue, Suite 2100
Detroit, MI 48226
(313) 733-3939
kajohnson@jonesday.com

***Counsel for Petitioner-Defendant National Beef Packing Company, LLC***

Karl J. Worsham
Kristine J. Beaudoin
**ASHURST PERKINS COIE US LLP**
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
Tel: (602) 351-8000
Karl.Worsham@ashurstperkins.com
Kristine.Beaudoin@ashurstperkins.com

Susan E. Foster
Katherine Galipeau
**ASHURST PERKINS COIE US LLP**
1301 Second Ave, Suite 4200
Seattle, WA 98101-3804
Tel: (206) 359-8000
Susan.Foster@ashurstperkins.com
Katie.Galipeau@ashurstperkins.com

Veronica N. Onyema
Jon B. Jacobs
Ryan Maddock
**ASHURST PERKINS COIE US LLP**
700 13th Street, NW, Suite 800
Washington, DC 20005-3960
Tel: (202) 654-6200
Veronica.Onyema@ashurstperkins.com
Jon.Jacobs@ashurstperkins.com
Ryan.Maddock@ashurstperkins.com

H. Rowan Gaither IV
**ASHURST PERKINS COIE US LLP**
1155 Avenue of the Americas, Floor 22
New York, NY 10036-2711
Tel: (212) 262-6900
Rowan.Gaither@ashurstperkins.com

***Counsel for Petitioners-Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc.***

Beth A. Wilkinson
Kosta S. Stojilkovic
Sarah Neuman
David R. Friedman
**WILKINSON STEKLOFF LLP**
2001 M Street, NW, 10th Floor
Washington, DC 20036
(202) 847-4010
bwilkinson@wilkinsonstekloff.com
kstojilkovic@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
dfriedman@wilkinsonstekloff.com

X. Kevin Zhao
Holley C. M. Horrell
Davida S. McGhee Williams
Nicholas Scheiner
Emily M. McAdam
Taofikat Ninalowo-Olaofe
**GREENE ESPEL PLLP**
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
kzhao@greeneespel.com
hhorrell@greeneespel.com
dwilliams@greeneespel.com
emcadam@greeneespel.com
nscheiner@greeneespel.com
tninalowo-olaofe@greeneespel.com

Jacob D. Bylund
Robert C. Gallup
Dasha Ternavska
**FAEGRE DRINKER BIDDLE & REATH LLP**
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
robert.gallup@faegredrinker.com
dasha.ternavska@faegredrinker.com

Joan A. Akalaonu
**FAEGRE DRINKER BIDDLE & REATH LLP**
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
(312) 569-1000
joan.akalaonu@faegredrinker.com

Moira Penza
Owen Gallogly
Emily Clarke
**WILKINSON STEKLOFF LLP**
130 W 42nd Street, Floor 24
New York, NY 10036
(212) 294-8910
mpenza@wilkinsonstekloff.com
ogallogly@wilkinsonstekloff.com
eclarke@wilkinsonstekloff.com

***Counsel for Petitioners-Defendants Cargill, Incorporated and Cargill Meat Solutions Corporation***

## CERTIFICATION OF COMPLIANCE

I, Michelle Fischer, certify:

*Word Count.* This petition complies with the word limit of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the portions exempted by Rules 5(b)(1) and 32(f), it contains 5,177 words.

*Typeface.* This petition complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)(A) and (6) because it has been prepared using Microsoft® Word for Microsoft 365 in 14-point, Times New Roman font.

*Virus-Free*. This petition complies with Local Rule 28A(h)(2) because it has been scanned for viruses and is virus-free.

Dated: July 30, 2026

*/s/ Michelle Fischer*
Michelle Fischer

*Counsel for Petitioner-Defendant*
*National Beef Packing Company, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2026, I, Michelle Fischer, electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. I further certify that I served the foregoing on July 30, 2026, by email to the following counsel for Respondents-Plaintiffs, as well as next-day delivery to the first counsel listed at each address:

Patrick J. McGahan
David R. Scott
Amanda F. Lawrence
Michael P. Srodoski
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 Main Street, P.O. Box 192,
Colchester, CT 06415

Richard M. Paul III
David W. Bodenheimer
**PAUL LLP**
601 Walnut Street, Suite 300, Kansas City, Missouri 64106

Sean C. Russell
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300, San Diego, CA 92101

Bobby Pouya
Michael H. Pearson
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400,
Sherman Oaks, CA 91403

Ellen Meriwether
Jennifer W. Sprengel
Daniel O. Herrera
Kaitlin Naughton
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 South LaSalle Street, Suite 3210,
Chicago, IL 60603

Michael Schrag
George Sampson
Elizabeth C. Pritzker
Caroline Corbitt
**PRITZKER LEVINE LLP**
1900 Powell Street, Ste. 450,
Emeryville, CA 94602

K. Craig Wildfang
Thomas J. Undlin
Stacey P. Slaughter
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800,
Minneapolis, MN 55402

Anthony F. Fata
**KIRBY MCINERNEY LLP**
211 West Wacker Drive, Suite 550,
Chicago, IL 60606

Michael Montaño
**GUERRA LLP**
875 E. Ashby Place, Suite 1200, San
Antonio, Texas 78212

Dated: July 30, 2026

*/s/ Michelle Fischer*
Michelle Fischer

*Counsel for Petitioner-Defendant*
*National Beef Packing Company, LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE: CATTLE AND BEEF ANTITRUST LITIGATION

This Document Relates To:

CATTLE PLAINTIFF AND INDIRECT SELLER PLAINTIFFS ACTIONS

Case No. 22-3031 (JRT/JFD)

**MEMORANDUM OPINION AND ORDER DENYING CATTLE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, GRANTING-IN-PART AND DENYING-IN-PART INDIRECT SELLER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, AND DENYING DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY**

In this multidistrict litigation alleging price-fixing in the cattle and beef industry, five groups of plaintiffs seek class certification. This Order addresses the motions of the two groups of plaintiffs who directly or indirectly sell cattle to Defendants to be processed into beef: (1) the Indirect Seller Plaintiffs (who also refer to themselves as the Feeder Plaintiffs)[1] and (2) the Cattle Plaintiffs[2] (collectively, "Upstream Plaintiffs"). The Indirect Seller Plaintiffs seek certification of a Damages Class and an Injunctive Relief Class. The Cattle Plaintiffs seek certification of a Damages Class (also referred to by Cattle Plaintiffs

[1] As further discussed herein, the Indirect Seller Plaintiffs are generally people or entities that sold cattle to a feedlot that in turn sold those cattle to Defendants.

[2] As further discussed herein, the Cattle Plaintiffs are generally people or entities that sold cattle directly to Defendants.

as a "Producer Class"), an Injunctive Relief Class, and an Exchange Class (that includes people and entities who held long positions in certain Live Cattle Futures). Both the Indirect Seller Plaintiffs and the Cattle Plaintiffs submitted expert testimony in support of their motions for class certification. Defendants oppose the motions for class certification and request that the Court exclude at least portions of the experts' testimony.

The Court will deny the Indirect Seller Plaintiffs' motion for class certification. The Court declines to certify the Indirect Seller Plaintiffs' Damages Class because the Court concludes that the proposed class lacks predominance, the class is not clearly ascertainable, and it is not clear that the named plaintiffs meet the class definition. The Court declines to certify Indirect Seller Plaintiffs' proposed Injunctive Relief Class because of lack of cohesiveness. The Court will deny the Defendants' motions to exclude the Indirect Sellers' experts' testimony as moot.

The Court will grant in part and deny in part the Cattle Plaintiffs' motion for class certification. The Court will certify the proposed Damages Class; the Court will decline to certify the injunctive relief class at this time (but will allow the Cattle Plaintiffs to renew their motion for certification at a later date, if they so choose); and the Court will deny certification of the Exchange Class because more than a *de minimis* portion of the proposed class is uninjured. The Court will deny as moot the Defendants' motion to exclude Ms. Candice Rosevear, the Cattle Plaintiffs' expert supporting certification of the Exchange Class. The Court will also deny the Defendants' motion to exclude Dr. Russell

Lamb, the Cattle Plaintiffs' other expert because the Court concludes his analysis is useful and not so unreliable it should be excluded.

## BACKGROUND

### I. FACTS

Beginning in 2019, a series of class actions and individual actions were filed against the leading American beef packers alleging a conspiracy to generate elevated beef profit margins in violation of federal and state anti-trust laws, the Packers & Stockyard Act, 7 U.S.C. §§ 181–229, and the Commodity Exchange Act, 7 U.S.C. § 1 et seq. This multi-district litigation is the result of the consolidation of those actions.[3]

Plaintiffs include both Upstream Plaintiffs, who directly or indirectly sell cattle to Defendants, and Downstream Plaintiffs,[4] who directly or indirectly purchase beef from Defendants.[5]

[3] *In re Cattle Antitrust Litigation*, Civil No. 19-1222; *In re Cattle and Beef Antitrust Litigation*, Civil No. 20-1319; (*see also* Certified Copy of Transfer Order, MDL No. 22-3031, June 3, 2022, Docket No. 1.)

[4] Downstream Plaintiffs include (1) Direct Purchaser Plaintiffs (DPPs), (2) Commercial and Institutional Indirect Purchaser Plaintiffs (CIIPPs), and (3) Consumer Indirect Purchaser Plaintiffs (Consumer IPPs). The motions of the Downstream Plaintiffs and Defendants' motions to exclude Downstream Plaintiffs' experts are addressed in a concurrent order.

[5] For ease, all record citations in this Order are presented in a short form. Full record citations for all documents cited in this Order (and in the concurrent order addressing Downstream Plaintiffs) are included in Appendix 1.

Defendants[6] are beef packers who purchase cattle from feed lots ("fed cattle"), slaughter the cattle, and then process the resulting carcasses into beef to be sold. Defendants' profits are driven by both the cost they pay for the fed cattle and the price they can charge for the sale of beef. Collectively, Defendants account for over 80% of the fed cattle bought, slaughtered, and sold as beef in the United States. (*See* Omnibus Brief at 18, Docket No. 1200 (noting that the combined market share of the four largest beef packers has not changed since the early 1990s).)

## II. PROCEDURAL HISTORY

In September 2021, the Court began consolidating the direct purchaser plaintiff cases filed in the District of Minnesota for pretrial proceedings. (*See, e.g.*, Civil No. 19-1222, Order, Sept. 1, 2021, Docket No. 408.) The Cattle Class Plaintiffs, Consumer Indirect Purchaser Plaintiffs (Consumer IPPs), Commercial and Institutional Indirect Purchaser Class Plaintiffs (CIIPPs), and some direct action plaintiffs requested all cases be coordinated for pretrial purposes to simplify the proceedings. (Civil No. 20-1319, Stipulation, Oct. 8, 2021, Docket No. 246.) The Court agreed coordination would be efficient and coordinated the cases for pretrial proceedings under Civil No. 20-1319,

---

[6] "Defendants" herein refer to Cargill, Incorporated and Cargill Meat Solutions Corporation (collectively, "Cargill"); JBS S.A., JBS USA Food Company, Swift Beef Company, and JBS Packerland, Inc. (collectively, "JBS"); National Beef Packing Company, LLC ("National Beef"); and Tyson Foods, Inc., and Tyson Fresh Meats, Inc. (collectively, "Tyson"). (*See, e.g.*, Cattle Pls.' Third Consolidated Class Action Compl. at 1; Indirect Seller Pls.' Second Amended Class Action Compl. at 6.)

which it renamed as *In re Cattle and Beef Antitrust Litigation*. (Civil No. 20-1319, Order on Stipulation, Oct. 13, 2021, Docket No. 252.)

In 2022, additional cases brought by individual plaintiffs were filed in other federal district courts involving the same issues. (MDL No. 22-3031, Certified Copy of Transfer Order at 1, June 3, 2022, Docket No. 1.) Pursuant to 28 U.S.C. § 1407(a), the United States Judicial Panel on Multidistrict Litigation formed MDL No. 3031 and transferred three cases to this Court on June 3, 2022, finding that the cases involved common questions of fact and centralization in this Court would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation." (*Id.* at 1.)

The Court then consolidated the MDL Cases for pretrial proceedings under a master docket case entitled "*In re: Cattle and Beef Antitrust Litigation*." (*See* MDL No. 22-3031, Pretrial Order No. 1, Docket No. 21, Oct. 4, 2022.) In Pretrial Order No. 2, , the Court appointed liaison counsel for the Direct Action Plaintiffs (DAPs), Indirect Seller Plaintiffs, Cattle Plaintiffs, Direct Purchaser Plaintiffs (DPPs), Consumer IPPs, and CIIPPs. (MDL No. 22-3031, Dec. 1, 2022, Docket No. 91.) In Pretrial Order No. 3, the Court outlined the process by which future direct action plaintiffs could join the MDL. (MDL. No. 22-3031, Feb. 3, 2023, Docket No. 139.) Numerous additional DAPs have since joined the litigation.[7]

[7] Since the DAPs are not relevant to the present motions for class certification and motions to exclude expert testimony, they will not be discussed in detail.

## III. PROPOSED CLASSES

All Plaintiffs filed motions for class certification on September 25, 2024. Defendants oppose Plaintiffs' class certification motions. In this section, the Court will summarize the classes proposed by the Upstream Plaintiffs.

### A. Indirect Seller Plaintiffs (aka Feeder Cattle Plaintiffs)

Indirect Seller Plaintiffs (sometimes referred to as the Feeder Cattle Plaintiffs or Feeder Plaintiffs) are, generally, people or entities that sold cattle (sometimes referred to as feeder cattle) to a feedlot that in turn sold those cattle (now fed cattle) to Defendants. (*See* Indirect Seller Pls.' Second Amended Class Action Compl. ¶ 2.) The Indirect Seller Plaintiffs move for certification of two classes: a "Nationwide Injunctive Relief Class" pursuant to Rule 23(b)(2) and "Nationwide Damages Class," pursuant to Rule 23(b)(3). (Indirect Seller Pls.' Mot. at 3.)

#### 1. Injunctive Relief Class

For the Nationwide Injunctive Relief Class, the Indirect Seller Plaintiffs seek relief under the Clayton Act and ask the Court to certify the following class under Rule 23(b)(2):

> All natural persons and entities in the United States that sold Feeder Cattle to a Feedlot or Finishing Operation that in turn

> sold that cattle to one or more of the Defendants during the Class Period.[8]

(Indirect Seller Pls.' Mem. at 3.)

### 2. Damages Class

For the Nationwide Damages Class, the Indirect Seller Plaintiffs seek relief under the Packers and Stockyards Act and ask the Court to certify a class under Rule 23(b)(3) having the same definition as the Nationwide Injunctive Relief Class. (Indirect Seller Pls.' Mem. at 3–4.)

For both classes, Indirect Seller Plaintiffs use the following definitions:

- "Feeder Cattle" means "large frame or medium frame number-one or number-two steers or heifers sold directly to Feedlots or Finishing Operations at a weight between 700 and 899 pounds via face-to-face sales, video auction sales, internet auction sales, and live auction sales, which are fed to slaughter weight and sold to packers for beef production[.]" (*Id.*)
- "Feedlot," "Finishing Operation," and "Fed Cattle Producer" mean "a facility used for the intensive feeding of cattle with the purpose of adding enough bodyweight to make them ripe for slaughter[.]" (*Id.* at 4.)

---

[8] Excluded from the Class are "(i) Defendants, (ii) each Defendant's subsidiaries and affiliates; (iii) each Defendant's officers, directors, and employees; (iv) entities in which any Defendant or group of Defendants has a controlling interest; (v) the judicial officer(s) to whom this action is assigned; and (vi) the immediate family members, legal representatives, heirs, successors, or assigns of any party excluded under parts i–vi of this sentence." (Indirect Seller Pls.' Mem. at 4.)

- "Class Period" means June 1, 2015, to December 31, 2020. (*Id.*)

#### 3. Class Representatives & Class Counsel

Indirect Seller Plaintiffs propose naming the following named Plaintiffs as Class Representatives: David Hyatt d/b/a Hyatt Farms;[9] Terry Faul d/b/a Faul Land Improvements;[10] and Expense Reduction Services, Inc. ("ERS").[11] (*Id.* at 5; see also Indirect Seller Pls.' Mot. at 4.)

Indirect Seller Plaintiffs ask the Court to appoint their interim co-lead counsel, Paul LLP, Guerra LLP, and Turner & Associates, P.A., as Class Counsel. (Indirect Seller Pls.' Mem. at 55; see also Indirect Seller Pls.' Mot. at 4.)

### B. Cattle Plaintiffs

The Cattle Plaintiffs are, generally, people or entities that sold fed cattle directly to Defendants. (*See* Cattle Pls.' Third Consolidated Class Action Compl. ¶ 3.) The Cattle Plaintiffs move for certification of three classes: an Injunctive Relief Class pursuant to Rule 23(b)(3), a Damages Class pursuant to Rule 23(b)(2), and an Exchange Class, pursuant to Rule 23(b)(3). (Cattle Pls.' Mot. at 2–3.)

---

[9] David Hyatt "owns and operates Hyatt Farms, which sells roughly 100 feeder cattle per year to feedlots, either directly or via auction[.]" (Indirect Seller Pls.' Mem. at 5.)

[10] Terry Faul "owns and operates Faul Farms, which sells his feeder cattle to feedlots, either directly or via auction." (*Id.*)

[11] ERS "operates Horseshoe Ranch in Eastland, Texas . . .[and] sells feeder cattle primarily through video auctions to feedlots across the country." (*Id.*)

### 1. Injunctive Relief Class

For the Injunctive Relief Class, Cattle Plaintiffs appear to seek relief under § 26 of the Clayton Act (*see* Cattle Pls.' Mem. at 51 n.156 (citing 15 U.S.C. § 26)) and ask the Court to certify the following class under Rule 23(b)(2):

> All persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter from June 1, 2015 to February 29, 2020 other than pursuant to a Cost-Plus Agreement and/or a Profit Sharing Agreement.[12]

(Cattle Pls.' Mot. at 2-3.)

Cattle Plaintiffs use the following definitions for Cost-Plus Agreement and Profit Sharing Agreement:

- "Cost Plus Agreement" means "an agreement to purchase fed cattle at a price determined, in all or in part, by applying an agreed mark-up to an accounting of costs incurred by the fed cattle seller in providing finished fed cattle." (*Id.* at 2.)
- "Profit Sharing Agreement" means "an agreement to supply fed cattle to a Defendant pursuant to which the Defendant: (i) financed all or part of the

[12] Excluded from this Class are the Defendants, their officers, directors, management, employees, subsidiaries, affiliates, the attorneys of record in this matter, and the court, its staff and their family members. This exclusion includes, for the avoidance of doubt, lots of fed cattle harvested by Defendants: (a) in which Defendants, their subsidiaries and/or affiliates had a full or partial ownership interest; and/or (b) was finished at a feedlot owned by the Defendant, their subsidiaries and/or affiliates.

costs incurred by the seller in connection with the seller's purchase of unfinished cattle and/or the seller's efforts to finish unfinished cattle to slaughter weight (*e.g.*, feed); and/or (ii) agreed to share certain profits or losses of either the seller and/or the Defendant in relation to the cattle to be supplied." (*Id.*)

**2. Damages Class**

For the Damages Class (also referred to by Cattle Plaintiffs as a "Producer Class"), the Cattle Plaintiffs seek relief under the Sherman Act and ask the Court to certify a class under Rule 23(b)(3) having the same definition as the Injunctive Relief Class. (*Id.* at 2.)

**3. Exchange Class**

For the Exchange Class, Cattle Plaintiffs seek relief under the Commodity Exchange Act and ask the Court to certify the following class under Rule 23(b)(3):

> All persons or entities who held a long position in Live Cattle Futures traded on the CME prior to June 1, 2015, and subsequently liquidated the long position through an offsetting market transaction at any point prior to November 1, 2016.[13]

(*Id.*)

---

[13] "Excluded from this Class are the Defendants, their officers, directors, management, employees, subsidiaries, affiliates, the attorneys of record in this matter, and the court, its staff and their family members." (Cattle Pls.' Mot. at 2.)

### 4. Class Representatives & Class Counsel

Cattle Plaintiffs propose certain named Plaintiffs as Class Representatives for each proposed class. (Cattle Pls.' Mot. at 1 n.1.) For the Injunctive Relief Class, Cattle Plaintiffs propose naming Ranchers Cattlemen Action Legal Fund United Stockgrowers of America Farmers Educational and Cooperative Union of America; Weinreis Brothers Partnership; Minatare Feedlot Inc.; Charles Weinreis; Eric Nelson; James Jensen d/b/a Lucky 7 Angus; and Richard C. Chambers as trustee of the Richard C. Chambers Living Trust as Class Representatives. (*Id.*) For the Damages Class, Cattle Plaintiffs propose naming Weinreis Brothers Partnership; Minatare Feedlot Inc.; Charles Weinreis; Eric Nelson; James Jensen d/b/a Lucky 7 Angus; and Richard C. Chambers as trustee of the Richard C. Chambers Living Trust as Class Representatives. (*Id.*) For the Exchange Class, Cattle Plaintiffs propose naming Weinreis Brothers Partnership and Charles Weinreis as Class Representatives. (*Id.*)

## DISCUSSION

## I. STANDARD OF REVIEW

### A. Class Certification

To certify a class, the Upstream Plaintiffs must demonstrate compliance with Federal Rule of Civil Procedure 23. Rule 23 sets forth more than "a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rather, Upstream Plaintiffs must provide evidentiary proof of each of Rule 23's elements. *Id.* It is the Court's duty to conduct a rigorous analysis before certifying a class, which necessarily requires that the

Court consider some issues that bear on the merits of a claim. *Id.* at 33–34. But courts considering class certification are not expected to resolve questions regarding the merits at this stage. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459–60 (2013).

To certify a class, Upstream Plaintiffs must first show they meet the requirements of Rule 23(a). See generally Fed. R. Civ. P. 23; *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). These requirements are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Then, Upstream Plaintiffs must satisfy one of the three 23(b) categories to be certified. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Rule 23(b)(1) covers cases in which separate actions by class members would "risk establishing incompatible standards of conduct for the party opposing the class." *Id.* (internal quotation marks omitted). Rule 23(b)(2) specifically allows declaratory or injunctive relief when the party opposing the class "has acted or refused to act on grounds generally applicable to the class." *Id.* Rule 23(b)(3) actions are designed to secure

judgments that bind all class members—unless those class members affirmatively elect to be excluded from the class. *Id.* at 614–15.

**1. Rule 23(b)(2)**

Although Rule 23(b)(2) allows declaratory or injunctive relief when the party opposing the class "has acted or refused to act on grounds that apply generally to the class," Fed. R. Civ. P. 23(b)(2), "[c]lass certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive." *In re St. Jude*, 425 F.3d at 1121. Additionally, although "Rule 23(b)(2) contains no predominance or superiority requirements, class claims thereunder still must be cohesive." *Id.*

**2. Rule 23(b)(3)**

Rule 23(b)(3) requires "that the questions of law or fact common to class members **predominate** over any questions affecting only individual members, and that a class action is **superior** to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). Thus, there are two main requirements: (1) predominance and (2) superiority.

"The predominance requirement is 'demanding'; a court considering certification pursuant to Rule 23(b)(3) must take a 'close look at whether common questions predominate over individual ones.'" *Hudock v. LG Electronics U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021) (quoting *Comcast*, 569 U.S. at 34). However, "there are no bright lines for determining whether common questions predominate." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995). A claim will meet the predominance requirement

"when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Id.*

Analysis of predominance may overlap with the merits of the case, but a court "should not resolve the merits of the case at class certification." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 617 (8th Cir. 2011). Rather, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc.*, 568 U.S. at 459. While rigorous, the inquiry at this stage is limited to determining whether common evidence **could** suffice to make out a prima facie showing of liability on the plaintiffs' theory. *In re Zurn Pex*, 644 F.3d at 618.

The Eighth Circuit has advised that the "closer any dispute at the class certification stage comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require." *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005). Factual and merits disputes "may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." *Id.* Plaintiffs may use any admissible evidence at this stage in the litigation. *In re Zurn Pex*, 644 F.3d at 612–14.

Predominance is "readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods.,* 521 U.S. at 625; *see also In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 271 (D. Minn. 1989) ("Plaintiffs have alleged a nationwide horizontal price-fixing conspiracy . . . [p]roof of such an antitrust violation involves primarily common issues of fact and law."). But predominance is also often the determining factor in declining to certify a class in an antitrust action. *E.g., Blades,* 400 F.3d at 572 (refusing to certify a class because the plaintiffs could not prove classwide injury with common evidence, as required for predominance).

To be successful in this litigation, Upstream Plaintiffs must prove (1) that Defendants conspired to violate federal antitrust laws, (2) that class members suffered injury because of the violation ("impact"), and (3) that plaintiffs can measure the damages. *Blades*, 400 F.3d at 566. Common evidence must be used to satisfy all three of these elements to meet Rule 23(b)(3)'s predominance requirement.

**a. Predominance—Uninjured Class Members**

Many circuits have instructed district courts to "ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (internal quotation marks omitted). *See also Blades*, 400 F.3d at 571 (refusing to certify classes where "not every member of the proposed classes can prove with common evidence that they suffered impact from the alleged conspiracy").

A class cannot be certified if more than a *de minimis* portion of the class is uninjured. The Eighth Circuit has not yet determined what constitutes *de minimis*, but other courts have held between approximately five and ten percent would justify refusing to certify the class. *See, e.g., In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018) (reversing certification after concluding that ten percent of class members were uninjured); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-1833, 2015 WL 3623005, at *20 (E.D. Pa. June 10, 2015) (finding five percent combined with a "substantial" likelihood that other categories mentioned of uninjured class members would be within the proposed class to be more than *de minimis*).

**3. Ascertainability**

Though not an explicit requirement under Rule 23, most courts acknowledge that ascertainability is inherently required for class certification. The Eighth Circuit has explained that "[i]t is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Ihrke v. N. States Power Co.*, 459 F.2d 566, 573 n.3 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815 (1972). The Eighth Circuit does not view ascertainability as a separate, preliminary requirement, but rather requires district courts to conduct "a rigorous analysis of the Rule 23 requirements, which includes that a class must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (internal quotation marks omitted); *see also Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012).

Although the Eighth Circuit has opined that a "class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017), it has not provided much guidance on when a class is not ascertainable. The Eighth Circuit has, however, indicated that "a dispute regarding the method for identifying class members calls for an independent discussion of whether a class is ascertainable." *Id.*

**B. Excluding Expert Testimony**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. An expert's opinion testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In essence, there are three prerequisites to admitting expert testimony: (1) the evidence is relevant and helpful for the finder of fact, (2) the proposed witness is qualified to assist the finder of fact, and (3) the proposed evidence must be reliable. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). For evidence to be reliable, it must be based upon sufficient facts or data, be a product of reliable principles and

methods, and the witness must have applied the principles and methods reliably to the facts of the case. *Id.*

The district court acts as a gatekeeper to the consideration of expert testimony by engaging in a *Daubert* analysis to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Lauzon,* 270 F.3d at 686. *Daubert* and its progeny have generated a number of nonexclusive factors for courts to consider in this analysis. *Lauzon*, 270 F.3d at 686–87. And "the inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert*, 509 U.S. at 594.

At the class certification stage, the Court conducts a "focused" *Daubert* inquiry to assess whether the opinions of the proposed experts, based on their areas of expertise and the reliability of their analyses of the available evidence, should be considered in deciding the issues relating to class certification. *In re Zurn Pex*, 644 F.3d at 610 (8th Cir. 2011); *see also Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925 n.2 (8th Cir. 2015). The main purpose of the full *Daubert* analysis is for the district court to act as a gatekeeper to protect "juries from being swayed by dubious scientific testimony." *In re Zurn Pex*, 644 F.3d at 613. Because there is less need for the Court to protect only itself, the Court may conduct a less stringent application of Rule 702 and *Daubert* at the class certification stage. *See id.*

As a result, when deciding whether to exclude testimony at this preliminary stage, where evidence is still evolving and uncertain, the Court considers "the expert testimony in light of the criteria for class certification and the current state of the evidence." *Id.* at 614. The Court need not decide conclusively if the evidence it considers at this stage "will ultimately be admissible at trial." *Id*. at 611. "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006). And the Eighth Circuit has generally stated that "district courts are admonished not to weigh or assess the correctness of competing expert opinions." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).

## II. INDIRECT SELLER PLAINTIFFS

The Indirect Seller Plaintiffs move to certify a Damages Class and an Injunctive Relief Class. Defendants oppose the certification of both classes. The Court will not certify the Indirect Seller Plaintiffs' Damages Class because the Court concludes that common issues of fact do not predominate, the class is not clearly ascertainable, and it is not clear that the named plaintiffs meet the class definition. The Court will further decline to certify the Indirect Seller Plaintiffs' Injunctive Relief Class for lack of cohesiveness.

Defendants move to exclude certain opinions of Indirect Seller Plaintiffs' expert Dr. Gareth Macartney and to exclude all of the opinions of Indirect Seller Plaintiffs' expert Ms. Anna King. The Court will deny these motions as moot.

**A. Damages Class**

Class certification under Rule 23(b) is appropriate only where common issues of fact or law predominate over individual questions. Fed. R. Civ. P. 23(b)(3). Where members of the proposed class cannot prove class membership with proof common to the class, class certification is not proper. *Blades*, 400 F.3d at 572–75. Further, the Court is required to conduct "a rigorous analysis of the Rule 23 requirements" including whether a class is "adequately defined and clearly ascertainable." *Sandusky*, 821 F.3d at 996. Where, as here, there is "a dispute regarding the method for identifying class members," the Eighth Circuit has indicated "an independent discussion of whether a class is ascertainable" is called for. *McKeage*, 847 F.3d at 998.

Indirect Seller Plaintiffs ask the Court to certify a class that includes all "natural persons and entities . . . that sold Feeder Cattle to a Feedlot or Finishing Operation that in turn sold that cattle to one or more of the Defendants during the Class Period." (Indirect Seller Pls.' Mem. at 3.) Feeder Cattle are defined as "large frame or medium frame number-one or number-two steers or heifers sold directly to Feedlots or Finishing Operations at a weight between 700 and 899 pounds . . . ." (*Id.* at 3–4.)

But it is not clear that the named plaintiffs themselves fall within the proposed class definition. Indirect Seller Plaintiffs provide evidence that each of the named plaintiffs sold cattle to a feedlot, and that the feedlot in turn sold cattle to Defendants. Yet the Indirect Seller Plaintiffs fail to provide any evidence that a single animal meeting **all** the criteria of the definition of Feeder Cattle (including, that the steer or heifer is "large

frame or medium frame number-one or number-two" and at a weight between 700 and 899 pounds") was sold to a feedlot. (*See* Indirect Seller Pls.' Mem. at 3–4 (defining "Feeder Cattle").) The Indirect Seller Plaintiffs instead ask the Court to rely on statistical probabilities.[14]

In addition, the Indirect Seller Plaintiffs provide no evidence that any specific animal fitting the definition of "Feeder Cattle" when it was bought by a Feedlot or Finishing Operation was later sold to a Defendant. Again, the Indirect Seller Plaintiffs instead ask the Court to rely on statistical probabilities.[15] Nor do the Indirect Seller Plaintiffs allege that the Feedlots or Finishing Operations sold **only** to Defendants. In short, although it is probable, there is no firm evidence that any specific animal sold by the Feedlot or Finishing Operation from a named plaintiff was, in turn, sold to a Defendant.

In the end, not even the named plaintiffs have firm (much less common) evidence that supports they are members of the class. While the criteria are objective, *see*

---

[14] *See, e.g.,* Indirect Seller Pls.' Sur-Resp. at 2 ("Hyatt sold medium/large frame Angus and Simmental cattle. Angus and Simmental breeds are generally medium/large frame."); *id.* at 1, 2 ("Angus and Simmental cattle are generally grades 1 or 2."); *id.* at 2 ("Faul sold 143 head with an average weight of 794.26 pounds.").

[15] *See, e.g.,* Indirect Seller Pls.' Sur-Resp. at 1 ("Hyatt sold Feeder Cattle to Pennington Land & Cattle, which sold cattle to Defendants monthly during the class period[.]"); *id.* at 2 ("ERS sold Feeder Cattle to Dumas Feedyard, which sold cattle to Defendants monthly during the class period[.]"); *id.* ("Faul sold Feeder Cattle to Daniel Froman, who fed them at Great Bend Feeders, which sold cattle to Defendants monthly during the class period[.]").

*McKeage* 847 F.3d at 998, it is not clear that the criteria can be used to identify the members of the proposed class. Because it is unclear whether the named plaintiffs fall within the proposed class definition, the Court cannot reasonably conclude that common issues of fact predominate. The Court will, therefore, decline to certify the Indirect Seller Plaintiffs' proposed Damages Class.

### B. Injunctive Relief Class

Indirect Seller Plaintiffs seek certification of an Injunctive Relief class under Rule 23(b)(2). Although class certification under Rule 23(b)(2) "contains no predominance or superiority requirements, class claims thereunder still must be cohesive." *In re St. Jude*, 425 F.3d at 1121. "The members of a (b)(2) class are generally bound together through preexisting or continuing legal relationships or by some significant common trait such as race or gender." *Id.* (quoting *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 n.8 (11th Cir. 1983)) (internal quotation marks omitted). Moreover, "even greater cohesiveness generally is required [under Rule 23(b)(2)] than in a Rule 23(b)(3) class." *Id.*

Here, the Indirect Seller Plaintiffs have not identified what binds their proposed Injunctive Relief class together. The Court is, simply put, unable to identify what "significant common trait" would bind the proposed Injunctive Relief Class together. *Id.* As described above, the Indirect Seller Plaintiffs' proposed class definition creates numerous individualized issues including whether a proposed class member sold an animal having **all** the characteristics of "Feeder Cattle" to a Feedlot or Finishing Operation. Further, even if those animals could be identified, it is unclear whether those same

animals were sold to Defendants. In short, there are too many "disparate questions undermining class cohesion in this case." *Amchem Prod.*, 521 U.S. at 624 (finding no class cohesion when class members "were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods" and some class members suffered no physical injury).

Because the proposed Injunctive Relief Class is not cohesive, the Court will deny class certification.

## III. CATTLE PLAINTIFFS

The Cattle Plaintiffs move to certify three classes: a Producer Class, an Exchange Class, and an Injunctive Relief Class. Defendants oppose certification of all three classes. Defendants also move to exclude certain opinions of Cattle Plaintiffs' experts, Dr. Lamb and Ms. Rosevear.

As further explained below, the Court will approve certification of the Cattle Plaintiffs' Producer Class, deny certification of the Cattle Plaintiffs' proposed Exchange Class because more than a *de minimis* portion of the proposed class is uninjured, and will decline to certify the injunctive relief class at this time. The Court will deny Defendants' motion to exclude certain opinions of Cattle Plaintiffs' expert, Dr. Lamb, and will deny as moot Defendants' motion to exclude portions of the expert report and testimony of Ms. Rosevear.

**A. Producer Class**

For the reasons detailed below, the Court will approve certification of the Cattle Plaintiffs' Producer Class (for which Cattle Plaintiffs seek damages), modified to exclude USPB shareholders, because the Court finds that the proposed Producer Class meets the requirements of Rule 23(a), is ascertainable, and satisfies the requirements of Rule 23(b)(3).

**1. Rule 23(a)**

The Defendants do not contest that the Cattle Plaintiffs' proposed Producer Class meets the requirements of Rule 23(a)(1), numerosity; 23(a)(2), commonality;[16] and 23(a)(3), typicality. Defendants do, however, argue that Cattle Plaintiffs have failed to establish that the named plaintiffs can adequately represent the Producer Class, as required by Rule 23(a)(4).

**a. Numerosity and Typicality**

The Court concludes that the proposed Producer Class satisfies the requirements of Rule 23(a)(1) and (a)(3), numerosity and typicality, respectively. There are thousands "persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter from June 1, 2015 to February 29, 2020." (Cattle Pls.' Mem. at vii;

[16] Defendants do contest whether Cattle Plaintiffs have demonstrated with common evidence that virtually all Cattle Plaintiffs were injured by Defendants' alleged conspiracy. (*See, e.g.*, Defs.' Opp. Cattle Pls.' Mot. 1, 14.) The Court will address these arguments as part of its Rule 23(b)(3) analysis when considering if Cattle Plaintiffs failed establish common impact.

*see also id.* at 31 (citing evidence).) Moreover, "other class members have claims similar to the named plaintiff[s]," satisfying the typicality requirement of Rule 23(a)(3). *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (citation omitted).

**b. Commonality**

To establish commonality under Rule 23(a)(2), class claims "must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, (2011). Federal courts in Minnesota have previously found that allegations of a nationwide horizontal price-fixing conspiracy in violation of § 1 of the Sherman Act primarily involve common issues of fact and law. *In re Pork Antitrust Litig.*, Civil No. 18-1776, 2024 WL 2060386, at *14 (D. Minn. May 8, 2024); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D. Minn. 1989).

Here, as in *In re Pork*, the "parties do not dispute that these claims satisfy the commonality requirement." 2024 WL 2060386, at *14. Proof of and defenses to the Defendants' alleged conspiracy are expected to be common to all class members, as is typical in nationwide horizontal price-fixing conspiracy class actions.

**c. Adequacy**

Defendants argue that the Cattle Plaintiffs have failed to establish that the named plaintiffs can adequately represent the Producer Class because of conflicts among the would-be class members. In particular, Defendants note that Charles Weinreis, a named

Cattle Plaintiffs, "holds shares in USPB [U.S. Premium Beef, LLC], an affiliate of Defendant National Beef, through which he received direct profit-sharing payments from the company." (Defs.' Opp. Cattle Pls.' Mot. at 3; *see also id.* at xi (defining USPB).) Defendants further argue that "the economic conflict implicates not just Weinreis but all USPB shareholders." (*Id.* at 46.) In fact, it is Weinreis Brothers' Partnership (WBP), not Charles Weinreis, who holds USPB shares. (Weinreis Dep. at 105:15–17.) Cattle Plaintiffs argue that WBP's "purported financial interest in National Beef is indirect[17] and *de minimis* and does not rise to the level of a fundamental conflict[.]" (Cattle Pls.' Reply at 27.)

The Court will modify the definition of the Cattle Plaintiffs' proposed Producer Class to exclude persons or entities who were USPB shareholders from June 1, 2015 to February 29, 2020.[18] *See, e.g.,* 6A Fed. Proc., L. Ed. § 12:58 ("A district court has broad discretion to modify class definitions, for the purpose of a class action.")

---

[17] USPB holds a 15% stake in National Beef, and USPB class A shareholders receive 10% of USPB's share of National Beef's profits. USPB class B shareholders receive 90% of USPB's share of National Beef's profits. (Lamb Expert Report ¶ 94.) Weinreis Brothers' Partnership holds both Class A and Class B shares. (Weinreis Dep. at 105:15–17.)

[18] The Court will not appoint Weinreis Brothers Partnership (WBP) as a class representative of the Producer Class. If however, Cattle Plaintiffs can present evidence to the Court that WBP was not a USPB shareholders between June 1, 2015 and February 29, 2020, Cattle Plaintiff may petition the Court to have WBP added as a class representative.

**2. Ascertainability**

The parties dispute whether the members of the Producer Class can be identified. While Cattle Plaintiffs seek to certify a class that includes "persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter" (Cattle Pls.' Mot. at 2), Defendants argue that identifying these persons or entities is complicated because the ownership of cattle sold to Defendants is difficult (if not impossible) to determine from Defendants' records. In short, Defendants argue there are insufficient "objective criteria" to identify the class members. *McKeage*, 847 F.3d at 998.

Defendants argue the biggest issue to identifying owners are "custom" feedlots. (Defs.' Opp. Cattle Pls.' Mot. at 9.) Custom feedlots are feedlots with which a cattle producer contracts; the cattle producer retains ownership of the cattle while the feedlot "finishes" the cattle and brokers the sale of the cattle to packers, including Defendants. (*See id.*; *see also* Lamb Expert Report ¶ 43.) Because of arrangements like this, Defendants argue, "Defendants generally do not know, and their records typically do not show, the actual owners of the fed cattle they purchase." (Defs.' Opp. Cattle Pls.' Mot. at 10.) Moreover, according to Defendants, "nearly half of all fed cattle are slaughtered at custom feedlots." (*Id.* at 44 (citing Lamb Expert Report ¶ 43 n. 67).)

While the Court understands that identifying the owners of the cattle from Defendants' records alone may not be possible, the task of identifying the owners is not so impossible as to prevent class certification. The criteria proposed by the Cattle Plaintiffs are adequately defined. *See Sandusky*, 821 F.3d at 996 ("[T]he class sought to

be represented must be adequately defined and clearly ascertainable." (quoting *Ihrike*, 459 F.3d at 573 n.3.)). Although it may be necessary to reference other records, including the owners' own records, along with the Defendants' records, it should be possible to determine who sold the cattle to Defendants. *See, e.g.*, *Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795, 805–06 (8th Cir. 2017) (affirming certification of a class of landowners where the class members would file "a sworn statement identifying the period of their ownership and attaching a deed"); *H & T Fair Hills, Ltd. v. All. Pipeline L.P.*, Civil No. 19-1095, 2021 WL 2526737, at *5 (D. Minn. June 21, 2021) (finding that changes in land ownership not present in Defendants' records did not mean the class could not be ascertained).

**3. Rule 23(b)(3) Predominance**

Defendants further argue that the Court should not certify the Producer class because "questions of law or fact common to class members" do not predominate over any questions affecting only individual members, as required by Rule 23(b)(3). Fed. R. Civ. P. 23(b)(3). Here, Defendants argue, members of the proposed class cannot prove class

membership with proof common to the class because Cattle Plaintiffs have failed to provide evidence that proves the elements of their claims on a class-wide basis.[19]

In particular, Defendants argue that Cattle Plaintiff's expert Dr. Lamb's model and analyses (a) assume—rather than show or prove—common impact; (b) use inapposite benchmarks; and (c) mask a significant percentage of uninjured class members. The Court will address each argument in turn.

**a. Common Impact**

Defendants argue that Cattle Plaintiffs failed to show common impact because of two flaws in Dr. Lamb's analysis. First, Defendants argue that Dr. Lamb's regression model inadequately ties Cattle Plaintiffs' theory of antitrust impact to the calculation of damages. Second, Defendants argue that Cattle Plaintiffs failed to establish that virtually all class members were impacted by the alleged unlawful conduct because Dr. Lamb's opinion masks uninjured class members. The Court will address each challenge in turn.

**i. Regression Model**

Defendants argue that Cattle Plaintiffs have failed to establish that virtually all class members were impacted by the alleged unlawful conduct because Cattle Plaintiffs'

[19] Defendants' arguments that class members cannot be identified touch several requirements of Rule 23, including predominance. To the extent Defendants are arguing that class members cannot be identified, the Court addresses this argument in the Ascertainability section, above, and finds that the proposed class is sufficiently ascertainable from objective criteria. To the extent that the Defendants are arguing that the class action is not manageable—and therefore is not superior to other available methods of adjudication—that is a Rule 23(b)(3) inquiry, addressed below.

regression model does not "tie" their "theory of antitrust impact" to their "calculation of damages." *Comcast*, 569 U.S. at 35. Specifically, Defendants argue that Cattle Plaintiffs' regression model "does not show that virtually all Cattle Plaintiffs were impacted by the alleged conduct because it does not show (or even try to show) that there was any reduction in the slaughter of fed cattle." (Defs.' Opp. Cattle Pls.' Mot. at 15).

But Cattle Plaintiffs' theory of harm is that "Defendants conspired to suppress fed cattle **prices"**—not total slaughter numbers—using various levers including "periodic restraint of their purchase and slaughter volume, market share management, and other coordinated conduct." (Cattle Pls.' Reply at 4 (emphasis added).) Plaintiffs allege that Defendants engaged in a "single, persistent conspiracy[.]" (*Id.* at 7.) Dr. Lamb's regression model is consistent with this allegation.

While Defendants may be correct that the alleged episodic conduct had only episodic impact, Defendants would have to present evidence to that end to undermine Cattle Plaintiffs' theory of harm to the fact finder at trial. At this class certification stage, Cattle Plaintiffs have met their burden by showing that their "damages case" is "consistent with their liability case." *Comcast*, 569 U.S. at 35.

**ii. Masking of Uninjured Class Members**

Defendants also argue that Cattle Plaintiffs have failed to establish that virtually all class members were impacted because the purported impact is not common to all class members. Specifically, Defendants argue that Dr. Lamb inappropriately used a common average model and conflated feedlot transactions with class member transactions.

With respect to Dr. Lamb's use of a common average model, Defendants contend that the use of such models obscure significant variations and uninjured class members. Though some courts are increasingly interrogating the application of averaging methodologies,[20] they may still be admissible if plaintiffs "have laid a sufficient foundation for the inferential finding that the impact reflected in the single average overcharge was shared by virtually every class member." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 199 (E.D. Pa. 2015); *see also In re Pork*, 2024 WL 2060386, at *11. That is, while a regression analysis like the one used by Dr. Lamb may not be used to show common impact,[21] it can be used if there is sufficient other evidence of common impact.

The Court finds there is sufficient evidence at this stage to conclude that all class members were impacted similarly enough over the entire Producer Class period to

---

[20] *See, e.g.*, Econometrics: Legal, Practical and Technical Issues § 13.A.1 (American Bar Association 2014); Donald Hawthorne & Margaret Sanderson, *Rigorous Analysis of Economic Evidence on Class Certification in Antitrust Cases*, 24 Antitrust 55, 55 (2009) (Noting the "divergent interpretations in lower courts over the showing that a plaintiff must make to prevail on a class certification motion").

[21] *See, e.g.*, *Handbook on Econometrics* at 222-23 (American Bar Association 2005) ("The reduced-form pricing equation assumes that a conspiracy has the same effect on every purchaser and focuses on an average effect, which may hide variation across class members. If one is attempting to test whether there is an impact on all members of a proposed class, however, that assumption is not valid, as it assumes the very proposition that is being tested.").

support the use of a common average model to estimate damages.[22] Cattle Plaintiffs and Dr. Lamb identified evidence of common impact to all class members across the Producer Class period. For example, Dr. Lamb analyzed the characteristics of the Fed Cattle Industry during Producer Class Period including Defendants' dominance of the packing stage of the fed cattle supply chain, the lack of elasticity in the supply of fed cattle and the inelastic demand for beef, and the presence of high barriers to entry into beef packing. (*See, e.g.*, Lamb Expert Report ¶ 189.) Dr. Lamb also analyzed the price structure for fed cattle prices paid to individual feedyards, as well as structural characteristics of the fed cattle market that would tend to prevent individual feedyards from avoiding the impact of the alleged conspiracy. (*Id.* ¶¶ 380–408.) Further, Cattle Plaintiffs and Dr. Lamb tied this evidence to Cattle Plaintiffs' allegations that Defendants "jointly manag[ed] slaughter" and backed up cattle to "pressure[] feeders to sell their product at reduced prices." (Cattle Pls.' Reply at 8 (citing relevant portions in Complaint).)

---

[22] The Court acknowledges the tension between this conclusion (that there is sufficient evidence to support common injury to all class members over the **entire** Producer Class period) and its conclusion, below, that the lack of evidence of injury to fed cattle producers during **certain** periods precludes certification of the Exchange Class. The Court concludes, however, that Cattle Plaintiffs have presented sufficient evidence of common impact to all proposed class members across the **entire** Producer Class period to support the use of a common average model to calculate damages for that entire period. But, as further discussed below, given the evidence that even if there were variations during shorter portions of the entire Producer Class period, the Cattle Plaintiffs did **not** present sufficient evidence that an average calculated for the entire class period could also support a finding of common impact during portions of the Producer Class period—including, for example, the proposed Exchange Class Period.

Dr. Lamb's common average model certainly masks some individualized issues and variations. But given the evidence of common impact across the entire proposed class period, the Court concludes Dr. Lamb "laid a sufficient foundation for the inferential finding that the impact reflected in a single average overcharge was shared by virtually every class member." *In re Pork*, 2024 WL 2060386, at *11 (quoting *In re Processed Egg Prods.*, 312 F.R.D. at 199).

Finally, although Dr. Lamb's opinion "rests on data covering only *feedlot* transactions, not *class member* [i.e., owner] transactions" (Defs.' Mem. Exclude Lamb at 20), Defendants have pointed to no reason why the feedlot payment data cannot be used as a proxy for owner payment data. In contrast, Cattle Plaintiffs indicate that for at least one Defendant, Cargill, feedyard and payee data was consistent. (Cattle Pls.' Reply at 19; *see also* Lamb Expert Report ¶ 15(c)(vii).) And underpayments, if any, to the feedyard, would be passed on to the owner, regardless of the ownership arrangement in place at the time of purchase by Defendants. (*See* Weinreiss Decl. ¶ 4; Chambers Dep. at 87.)

In sum, the Court concludes that there is sufficient evidence of common impact and Dr. Lamb's common average model may be used, at least at this class certification stage, to estimate damages to the Producer Class during the Producer Class period.

**b. Inapposite Benchmarks**

Defendants further argue that the Cattle Plaintiffs' proposed Producer Class should not be certified because Dr. Lamb's model does not actually demonstrate Defendants suppressed fed cattle prices. In particular, Defendants argue that Dr. Lamb used an

erroneous benchmark period that reflected a different stage of the Cattle Cycle and a period with "substantially greater industry capacity to slaughter fed cattle." (Defs.' Opp. Cattle Pls.' Mot. at 22.) However, Dr. Lamb used numerous variables to control for supply and demand across time periods, including controls for the differences in fed cattle supply arising from the different stages of the cattle cycle. (*E.g.*, Lamb Rebuttal Report ¶ 91–99.)

The Court will join courts from other circuits in finding that Defendants' criticism of Dr. Lamb's benchmark period goes to the weight, not the admissibility, of the testimony. *E.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) (concluding that a "benchmark-shopping argument does not implicate the reliability of [an expert's] methodology"); *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211, at *12 (E.D. Pa. Oct. 19, 2015).

* * *

In sum, the Court concludes that Cattle Plaintiffs have provided sufficient evidence that all class members were impacted similarly enough over the entire Producer Class period that questions of fact common to class members predominate.

**4. Rule 23(b)(3) Superiority**

In addition to predominance, Rule 23(b)(3) requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). While the Defendants do not directly attack the superiority of Cattle Plaintiffs' proposed Producer Class, they do argue that the proposed class action is not "manageable—and therefore not superior to other available methods of adjudication"

because the Court would not be able to "determine who is in the class and who is not without time-consuming collateral inquiries." 1 McLaughlin on Class Actions § 4:2 (22nd ed.); (*see also* Defs.' Opp. Cattle Pls.' Mot. at 44-45 (citing McLaughlin)).

The Court, however, concludes that the advantages of a class action outweigh the disadvantages, even if identifying the relevant persons or entities is complicated.

Class actions are superior when there are many common issues of law and fact relating to a defendant's liability. *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 n.5 (7th Cir. 2012). Here, the Cattle Plaintiffs' counsel have spent years in discovery collecting evidence of those common facts.

Class actions are also superior if there are numerous plaintiffs or if the alleged damages are small and absent a class action most plaintiffs would not realistically have a day in court. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Given that there are thousands of potential class members in this action (*see* Cattle Pls.' Mem. at 3), the difficulty for those class members to successfully bring individual claims (as demonstrated by the lack of individual actions by proposed class members), managing a class action—even with some difficulties with identifying the class members—is more efficient than juggling a multitude of individual actions. The Court concludes the superiority requirement is satisfied.

* * *

Because the Court concludes that the proposed Producer Class meets the requirements of Rule 23(a), is ascertainable, and satisfies the requirements of Rule 23(b)(3), including predominance and superiority, the Court will approve certification of the Cattle Plaintiffs' Producer Class, modified to exclude USPB shareholders.

### B. Exchange Class

Cattle Plaintiffs also ask the Court to certify an Exchange Class under Rule 23(b)(3) that would include "persons or entities who held a long position in Live Cattle Futures traded on the CME prior to June 1, 2015, and subsequently liquidated the long position through an offsetting market transaction at any point prior to November 1, 2016." (Cattle Pls.' Mot. at 2.) The Court will decline to certify the Cattle Plaintiffs' Exchange Class because it is likely that more than a *de minimis* portion of the proposed class is uninjured.

To calculate damages for the Exchange Class, Cattle Plaintiffs' expert for the Exchange Class, Ms. Rosevear, started from Dr. Lamb's analysis "that fed cattle prices would have been higher by 6.7%." (Rosevear Expert Report ¶ 41–42 (citing Lamb Report ¶¶ 377, 416 & Table 14).) Importantly, Dr. Lamb calculated this percentage over the **entire** Producer Class Period (June 1, 2015, to February 29, 2020) (Lamb Report ¶ 370 ("I use . . . June 1, 2015 through February 29, 2020 as the Class Period[.]") & ¶ 377 ("I find an Underpayment Rate . . . of 6.7 percent.")). Ms. Rosevear then used this calculated average underpayment in the physical market for fed cattle to calculate the "artificiality in the futures price" during the **Exchange** Class Period (June 1, 2015 to October 31, 2016) (Rosevear Expert Report ¶¶ 40, 53; see also Rosevear Rebuttal Report ¶ 117 ("6.7% . . .

was the underpayment percentage I was instructed to assume for the entire Exchange Class Period.”).)

But Defendants’ expert, Dr. Justin McCrary, also used Dr. Lamb’s model, and he calculated that average fed cattle prices from June 2015 to August 2015—part of the Exchange Class Period—were **higher** than the prices Dr. Lamb estimates would have prevailed absent Defendants’ alleged conspiracy. (McCrary Expert Report ¶¶ 340–42.) Dr. McCrary and Ms. Rosevear agree that if there was “no price suppression for fed cattle in those months, Exchange Class members who liquidated their positions during those months could not have been harmed.” (*Id.* ¶ 342 & n.593 (citing deposition testimony of Ms. Rosevear).) Moreover, more than 95 percent of the approximately 265,000 Live Cattle Futures contracts that Ms. Rosevear analyzed were sold in the first three months of the Exchange Class Period. (*Id.* ¶ 343; Rosevear Expert Report, Figs. 7 & 8.)

Cattle Plaintiffs argue that Defendants artificially crimped the window of analysis. The Court disagrees. Dr. Lamb chose to calculate average damages over the entire Producer Class Period—a period during which even Cattle Plaintiffs admit Defendants’ alleged restraint of purchases and slaughter volume was “periodic.” (Cattle Pls.’ Reply at 1.) Ms. Rosevear relied on the average calculated by Dr. Lamb over the entire Producer Class Period—an average which necessarily conceals variations. The Court is convinced by the evidence presented by Defendants’ expert that during the proposed Exchange Class Period, more than a *de minimis* number of contracts were not damaged. (*See, e.g.*,

McCrary Expert Report ¶¶ 340–41.) The Court will, therefore, deny certification of the Exchange Class.

The parties also argue extensively over whether the opinions of Ms. Rosevear should be excluded because of her use of a cost-of-carry model. The Court need not address these arguments. Because the Court will decline to certify the Exchange Class and Ms. Rosevear's opinions relate solely to the Exchange Class, Defendants' motion to exclude portions of the expert report and testimony of Ms. Rosevear will be denied as moot.

### C. Injunctive Relief Class

The Court will decline to certify the injunctive relief class at this time, but it will permit Cattle Plaintiffs, should they choose to do so, an opportunity to renew their motion for certification of a Rule 23(b)(2) class.

"Class certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive." *In re St. Jude*, 425 F.3d at 1121. *See also Dukes*, 564 U.S. at 360 (holding that certification under Rule 23(b)(2) is not appropriate if the monetary relief sought by the class "is not incidental to the injunctive or declaratory

relief"). Although the primary relief that the Cattle Plaintiffs are seeking is monetary damages, the parties have not addressed this issue.[23]

Further, the Cattle Plaintiffs have not been specific about what injunctive relief they seek and how that relief would provide appropriate relief to the entire class. Rule 23(c)(1)(B) requires that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses[.]" Federal Rule of Civil Procedure 65(d) provides that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail . . . the act or acts restrained or required." Although Cattle Plaintiffs indicate that the requested injunctive relief "will be focused on enjoining Defendants from conspiring to suppress fed cattle prices through collectively managing their slaughter volumes and purchasing" (Cattle Pls.' Reply at 28), Cattle Plaintiffs do not provide sufficient detail to allow the Court to determine whether the proposed relief would provide relief for the class as a whole or for the Court to properly scope its order certifying an Injunctive Relief Class.

The Court will, therefore, decline to certify the injunctive relief class at this time. As noted above, however, the Court will allow Cattle Plaintiffs, should they choose to do

[23] The court in *In re Processed Egg Prods.* noted that courts are divided over the propriety of certifying a Rule 23(b)(2) class where monetary damages predominate but the claims for damages and injunctive relief arise under different statutes. 312 F.R.D. at 166. Because the Court concludes that, in any event, the proposed injunctive relief is not yet clearly enough defined to certify the class, the Court will definitely address this issue only if the Cattle Plaintiffs choose to renew their motion at a later date.

so, to renew their motion for certification of a Rule 23(b)(2) class at a later date provided that they address why injunctive relief is proper and provide additional detail on the relief being sought.

### D. Dr. Lamb

Defendants ask the Court to exclude certain opinions and testimony of Cattle Plaintiffs' expert, Dr. Lamb. Specifically, Defendants ask the Court to exclude Dr. Lamb's regression model and all of his opinions based on it as well as Dr. Lamb's "'psychological impact' opinions." (Defs.' Mem. Exclude Lamb at 22.)

At this class certification stage, the Court need only assess whether the opinions of the proposed experts, based on their areas of expertise and the reliability of their analyses of the available evidence, should be considered in deciding the issues relating to class certification. *See In re Zurn Pex*, 644 F.3d at 612. The Court concludes that the opinions of Dr. Lamb should not be excluded at this class certification stage, but the Court will address the criticisms of his regression model and "psychological impact" opinions, in turn.

#### 1. Regression Model and Related Opinions

With respect to Dr. Lamb's regression model and his opinions based on it, Defendants argue that the model is based on unreliable methods. Specifically, Defendants argue that Dr. Lamb used an erroneous benchmark period, that he did not control for reduced slaughter capacity during the class period, and that Dr. Lamb's

regression model "generates false positives and is extremely sensitive to minor alterations." (Defs.' Mem. Exclude Lamb at 16.)

Defendants' challenges to the benchmark period used by Dr. Lamb are addressed above. Defendants' criticism of Dr. Lamb's benchmark period goes to the weight, not the admissibility, of the testimony.

With respect to Defendants' argument that Dr. Lamb should have included slaughter capacity as a variable in his regression model, Cattle Plaintiffs and Dr. Lamb respond that slaughter capacity is "endogenous" and is properly excluded as a variable from the model.[24] The Court concludes that Defendants' criticism of Dr. Lamb's model also goes to the weight not the admissibility of the testimony. *Maitland v. Univ. of Minnesota*, 155 F.3d 1013, 1017 (8th Cir. 1998) ("[I]f a regression analysis omits variables, it is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results . . . ."); *see also Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 605 (N.D. Ill. 2015) (finding criticism of an expert's selection of variables for multiple regression analysis to be "a merits question that the Court does not need to resolve in order to decide whether to certify the class").

---

[24] *See* Pls.' Opp. Exclude Lamb at 22; *see also, e.g.*, Lamb Expert Report ¶ 371 (explaining why Dr. Lamb concluded it would have been "inappropriate to include capacity utilization as an explanatory variable for measuring changes in prices to identify the effect of the alleged misconduct" because "capacity utilization would have been affected by the same alleged misconduct"); *see also* Lamb Rebuttal Report ¶ 93.

Finally, Defendants argue that "[m]inor edits in the parameters of Lamb's regression model lead to wildly divergent results." (Defs.' Mem. Exclude Lamb at 19.) In particular, Defendants' expert notes that changing the start date of the Class Period by just a few months can generate a result in which class members were not undercharged but, instead, received higher payments than the payments they would have received but-for the conspiracy. (*See* McCrary Expert Report ¶ 191 ) "It is true that sensitivity and robustness testing, which ask whether the models are sensitive to small changes, may be helpful in a *Daubert* analysis because they can speak to the model's reliability." *In re Pork*, 2024 WL 2060386, at *12 (citing *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018)). But the Court finds that a change in the start date is not a minor change.[25]

The Court also notes that there are significant differences between the opinions of Dr. Lamb and Defendants' expert, Dr. McCrary. But "district courts are admonished not to weigh or assess the correctness of competing expert opinions." *Johnson*, 754 F.3d at 562. The Court concludes Dr. Lamb used sufficiently reliable principles and methods and

---

[25] The Court declines to find a change in the start date to be a small change at least because the parties' experts disagree on whether the change is significant. (*See, e.g.,* Lamb Rebuttal Report ¶ 92 ("Changing this date represents a significant change to my model specification and is thus not a legitimate test of the robustness of my Underpayment Regression.").) Whether the Cattle Plaintiffs' evidence supports their arguments that the overcharge corresponds with Defendants' conduct is a question for the fact finder. If Defendants are correct that shifting the start date of the Class Period by just one month results in Dr. Lamb's calculated undercharge vanishing completely, then it is a question for the fact finder what weight to give the testimony.

reliably applied those principles and methods to the facts. The effect of certain variables and proposed model modifications are factors that "go to the weight to be given the testimony by the factfinder, not its admissibility." *Id.* at 564.

**2. Psychological Impact Opinions**

Defendants also contend that Dr. Lamb's opinions regarding the effect of Defendants' collective slaughter restraint on fed cattle prices are improper testimony concerning the "psychological impact" of Defendants' actions on the "psyche of market participants." (Defs.' Mem. Exclude Lamb at 22.) The Court understands that Dr. Lamb's testimony is based on a quotation of an email from a Tyson executive. (*See* Lamb Expert Report ¶ 326.)

As described above, there is less need for the Court to protect itself from dubious testimony than in the context of a jury trial, so a less stringent application of Rule 702 and *Daubert* is appropriate at the class certification stage. *See In re Zurn Pex*, 644 F.3d at 613. Given the Court's understanding of the basis of Dr. Lamb's opinions and the limitation of his expertise, there is no need to exclude Dr. Lamb's "psychological impact" opinions at this stage. The Court notes that it is not deciding if the evidence it considers at this stage, including this evidence, "will ultimately be admissible at trial." *Id*. at 611.

* * *

Accordingly, Defendants' motion to exclude certain opinions and testimony of Cattle Plaintiffs' expert Dr. Lamb will be denied for the purposes of class certification.

## IV. CLASS COUNSEL

Lastly, when certifying a class, the Court must also appoint class counsel. Fed. R. Civ. P. 23(g)(1). When considering whether to appoint class counsel, courts

> (A) must consider:
>
> > (i) the work counsel has done in identifying or investigating potential claims in the action;
> >
> > (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> >
> > (iii) counsel's knowledge of the applicable law; and
> >
> > (iv) the resources that counsel will commit to representing the class; [and]
>
> (B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.

*Id.* Additionally, "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Only if class counsel is adequate under all of these considerations may a court appoint an applicant as class counsel. Fed. R. Civ. P. 23(g)(2).

Because the firms that currently serve as interim co-lead counsel for the Cattle Plaintiffs have vigorously represented that class thus far in the litigation and are all well-versed in antitrust law, the Court will appoint them as class counsel:

1. Scott+Scott Attorneys at Law LLP and Cafferty Clobes Meriwether & Sprengel LLP will be appointed as Co-Lead Class Counsel for the Cattle Plaintiffs' Producer Class;

2. Robins Kaplan LLP will be appointed as Liaison Counsel for the Cattle Plaintiffs' Producer Class;

3. Kirby McInerney LLP, Pearson Warshaw, LLP, and Pritzker Levine LLP will be appointed to the Cattle Plaintiffs' Executive Committee.

## CONCLUSION

In this multidistrict litigation alleging price-fixing in the cattle and beef industry, five groups of plaintiffs seek class certification including Upstream Plaintiffs—who directly or indirectly sell cattle to Defendants to be processed into beef. Of the classes proposed by the Upstream Plaintiffs, the Court finds that only the Cattle Plaintiffs' Producer Class satisfies all of the requirements of Federal Rule of Civil Procedure 23, and the Court will certify this class. Because the other classes proposed by the Upstream Plaintiffs fail to satisfy at least one requirement of Rule 23, the Court will decline to certify those classes.

The Court will also deny Defendants' motions to exclude the Upstream Plaintiffs' experts' testimony either because the relevant expert report satisfies the less stringent *Daubert* standard employed at the class certification stage, or alternatively because the motion is moot.

Finally, although the Court will decline to certify the Cattle Plaintiffs' proposed Injunctive Relief Class at this time, the Cattle Plaintiffs may, should they choose to do so, renew their motion for certification of a Rule 23(b)(2) class at a later date provided they

address why injunctive relief is proper and provide additional detail on the relief being sought.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Indirect Seller Plaintiffs' Motion for Class Certification (Docket No. [882]) is **DENIED**.

2. Defendants' Motion to Exclude the Opinions of Ms. Anna King (Docket No. [1148]) is **DENIED as moot**.

3. Defendants' Motion to Exclude Certain Opinions of Dr. Gareth Macartney (Docket No. [1134]) is **DENIED as moot**.

4. Cattle Plaintiffs' Motion for Class Certification (Docket No. [875]) is **GRANTED IN PART and DENIED IN PART**, as follows:

    a. **GRANTED** with respect to the Producer Class;

        i. The following class is hereby certified under Federal Rule of Civil Procedure 23(b)(3):

            All persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter from June 1, 2015 to February 29, 2020 other than pursuant to a Cost-Plus Agreement and/or a Profit Sharing Agreement.

            Excluded from this Class are the Defendants, their officers, directors, management, employees,

subsidiaries, affiliates, the attorneys of record in this matter, and the court, its staff and their family members. This exclusion includes, for the avoidance of doubt, lots of fed cattle harvested by Defendants: (a) in which Defendants, their subsidiaries and/or affiliates had a full or partial ownership interest; and/or (b) was finished at a feedlot owned by the Defendant, their subsidiaries and/or affiliates.

Also excluded from this Class are any persons or entities who were U.S. Premium Beef, LLC (USPB) shareholders from June 1, 2015 to February 29, 2020.

"Cost Plus Agreement" means an agreement to purchase fed cattle at a price determined, in all or in part, by applying an agreed mark-up to an accounting of costs incurred by the fed cattle seller in providing finished fed cattle.

"Profit Sharing Agreement" means an agreement to supply fed cattle to a Defendant pursuant to which the Defendant: (i) financed all or part of the costs incurred by the seller in connection with the seller's purchase of unfinished cattle and/or the seller's efforts to finish unfinished cattle to slaughter weight (e.g., feed); and/or (ii) agreed to share certain profits or losses of either the seller and/or the Defendant in relation to the cattle to be supplied.

ii. Minatare Feedlot Inc.; Charles Weinreis; Eric Nelson; James Jensen d/b/a Lucky 7 Angus; and Richard C. Chambers as trustee of the Richard C. Chambers Living Trust are appointed as class representatives.

iii. Scott+Scott Attorneys at Law LLP and Cafferty Clobes Meriwether & Sprengel LLP are appointed as Co-Lead Class Counsel.

iv. Robins Kaplan LLP is appointed as Liaison Counsel.

v. Kirby McInerney LLP, Pearson Warshaw, LLP, and Pritzker Levine LLP are appointed to the Cattle Plaintiffs' Executive Committee.

b. **DENIED** with respect to the Exchange Class.

c. **DENIED without prejudice** with respect to the Injunctive Relief Class.

5. Defendants' Motion to Exclude Certain Opinions of Dr. Russell Lamb (Docket No. [1101]) is **DENIED**.

6. Defendants' Motion to Exclude Portions of the Expert Report and Testimony of Ms. Candice L. Rosevear (Docket No. [1107]) is **DENIED as moot**.

DATED: July 16, 2026
at Minneapolis, Minnesota.

/s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge

Addresses for Case Participants:

Joan A. Akalaonu
FAEGRE DRINKER BIDDLE & REATH LLP
320 South Canal Street, Suite 3300, Chicago, IL 60606-5707

Eric P. Barstad
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402

Kristine J. Beaudoin
ASHURST PERKINS COIE US LLP
2525 E. Camelback Road, Suite 500, Phoenix, Arizona 85016

David W. Bodenheimer
PAUL LLP
601 Walnut Street, Suite 300, Kansas City, Missouri 64106

Samantha J. Burke
ASHURST PERKINS COIE US LLP
2525 E. Camelback Road, Suite 500, Phoenix, Arizona 85016

Jacob D. Bylund
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor, Des Moines, IA 50309

Emily Clarke
WILKINSON STEKLOFF LLP
130 W 42nd Street, Floor 24, New York, NY 10036

Michelle Conston
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building, 230 Park Avenue, 17th Floor, New York, NY 10169

Caroline Corbitt
PRITZKER LEVINE LLP
1900 Powell Street, Ste. 450, Emeryville, CA 94602

Benjamin L. Ellison
JONES DAY
90 South Seventh Street, Suite 4950, Minneapolis, MN 55402

Thomas W. Elrod
KIRBY MCINERNEY LLP
250 Park Avenue, Suite 820, New York, NY 10177

Anthony F. Fata
KIRBY MCINERNEY LLP
211 West Wacker Drive, Suite 550, Chicago, IL 60606

Michelle Fischer
JONES DAY
901 Lakeside Avenue, North Point, Cleveland, OH 44114

Susan E. Foster
ASHURST PERKINS COIE US LLP
1301 Second Ave, Suite 4200, Seattle, WA 98101-3804

David R. Friedman
WILKINSON STEKLOFF LLP
130 W 42nd Street, Floor 24, New York, NY 10036

H. Rowan Gaither IV
ASHURST PERKINS COIE US LLP
1155 Avenue of the Americas, Floor 22,

New York, NY 10036-2711

Katherine Galipeau
ASHURST PERKINS COIE US LLP
1301 Second Ave, Suite 4200, Seattle, WA 98101-3804

Owen Gallogly
WILKINSON STEKLOFF LLP
130 W 42nd Street, Floor 24, New York, NY 10036

Robert C. Gallup
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor, Des Moines, IA 50309

Francisco "Frank" Guerra IV
GUERRA LLP
875 E. Ashby Place, Suite 1200, San Antonio, Texas 78212

Joseph P. Guglielmo
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building, 230 Park Avenue, 17th Floor, New York, NY 10169

Daniel Gustafon
GUSTAFON GLUEK PLLC
120 S. 6th St., Suite 2600, Minneapolis, MN, 55402

Eddie Hasdoo
JONES DAY
110 North Wacker, Suite 4800, Chicago, Illinois 60606

Daniel O. Herrera
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
135 South LaSalle Street, Suite 3210, Chicago, IL 60603

Holley C. M. Horrell
GREENE ESPEL PLLP
222 S. Ninth Street, Suite 2200, Minneapolis, MN 55402

Anna Hunanyan
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building, 230 Park Avenue, 17th Floor, New York, NY 10169

Jon B. Jacobs
ASHURST PERKINS COIE US LLP
700 13th Street, NW, Suite 800, Washington, DC 20005-3960

Kurt Johnson
JONES DAY
150 W Jefferson Ave Ste 2100, Detroit, MI 48226

David E. Kovel
KIRBY MCINERNEY LLP
250 Park Avenue, Suite 820, New York, NY 10177

Geoff Kozen
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402

Amanda F. Lawrence
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 Main Street, P.O. Box 192, Colchester, CT 06415

Ryan Maddock
ASHURST PERKINS COIE US LLP
700 13th Street, NW,

Suite 800, Washington, DC 20005-3960

Emily M. McAdam
GREENE ESPEL PLLP
222 S. Ninth Street, Suite 2200, Minneapolis, MN 55402

Julia E. McEvoy
JONES DAY
51 Louisiana Avenue, N.W., Washington, D.C. 20001-2113

Patrick J. McGahan
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 Main Street, P.O. Box 192, Colchester, CT 06415

Davida S. McGhee Williams
GREENE ESPEL PLLP
222 S. Ninth Street, Suite 2200, Minneapolis, MN 55402

Ellen Meriwether
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
135 South LaSalle Street, Suite 3210, Chicago, IL 60603

Michael Montaño
GUERRA LLP
875 E. Ashby Place, Suite 1200, San Antonio, Texas 78212

Kaitlin Naughton
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
135 South LaSalle Street, Suite 3210, Chicago, IL 60603

Sarah Neuman
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor, Washington, DC 20036

Taofikat Ninalowo-Olaofe
GREENE ESPEL PLLP
222 S. Ninth Street, Suite 2200, Minneapolis, MN 55402

Alicia O'Neill
GUERRA LLP
875 E. Ashby Place, Suite 1200, San Antonio, Texas 78212

Veronica N. Onyema
ASHURST PERKINS COIE US LLP
700 13th Street, NW, Suite 800, Washington, DC 20005-3960

Richard M. Paul III
PAUL LLP
601 Walnut Street, Suite 300, Kansas City, Missouri 64106

Michael H. Pearson
PEARSON WARSHAW, LLP
15165 Ventura Boulevard, Suite 400, Sherman Oaks, CA 91403

Moira Penza
WILKINSON STEKLOFF LLP
130 W 42nd Street, Floor 24, New York, NY 10036

Matthew J. Perez
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building, 230 Park Avenue, 17th Floor, New York, NY 10169

Bobby Pouya
PEARSON WARSHAW, LLP

15165 Ventura Boulevard, Suite 400, Sherman Oaks, CA 91403

Elizabeth C. Pritzker
PRITZKER LEVINE LLP
1900 Powell Street, Ste. 450, Emeryville, CA 94602

Sean C. Russell
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300, San Diego, CA 92101

George Sampson
PRITZKER LEVINE LLP
1900 Powell Street, Ste. 450, Emeryville, CA 94602

Nicholas Scheiner
GREENE ESPEL PLLP
222 S. Ninth Street, Suite 2200, Minneapolis, MN 55402

Michael Schrag
PRITZKER LEVINE LLP
1900 Powell Street, Ste. 450, Emeryville, CA 94602

Ashlea G. Schwarz
PAUL LLP
601 Walnut Street, Suite 300, Kansas City, Missouri 64106

David R. Scott
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 Main Street, P.O. Box 192, Colchester, CT 06415

Stacey P. Slaughter
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402

Jennifer W. Sprengel
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
135 South LaSalle Street, Suite 3210, Chicago, IL 60603

Michael P. Srodoski
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 Main Street, P.O. Box 192, Colchester, CT 06415

Kosta S. Stojilkovic
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor, Washington, DC 20036

Barry G. Stratford
ASHURST PERKINS COIE US LLP
2525 E. Camelback Road, Suite 500, Phoenix, Arizona 85016

Dasha Ternavska
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor, Des Moines, IA 50309

Clyde Talbot "Tab" Turner
TURNER & ASSOCIATES, P.A.
4705 Somers Avenue, North Little Rock, Arkansas 72116

Thomas J. Undlin
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402

Daniel Warshaw
PEARSON
WARSHAW, LLP
15165 Ventura
Boulevard, Suite 400,
Sherman Oaks, CA
91403

K. Craig Wildfang
ROBINS KAPLAN
LLP
800 LaSalle Avenue,
Suite 2800,
Minneapolis, MN
55402

Beth A. Wilkinson
WILKINSON
STEKLOFF LLP
2001 M Street, NW,
10th Floor,
Washington, DC
20036

Karl J. Worsham
ASHURST PERKINS
COIE US LLP
2525 E. Camelback
Road, Suite 500,
Phoenix, Arizona
85016

X. Kevin Zhao
GREENE ESPEL
PLLP
222 S. Ninth Street,
Suite 2200,
Minneapolis, MN
55402